*189
 
 OPINION OF THE COURT
 

 Wesley, J.
 

 In May 1996, the Legislature amended the Environmental Conservation Law, requiring New York City to close Staten Island’s Fresh Kills landfill by January 1, 2002
 
 (see
 
 ECL 27-0706). The New York City Department of Sanitation (DOS) sought to reduce the amount of waste deposited in Fresh Kills in the interim until the City could adopt a final plan. In that regard, DOS in 1999 proposed the “Manhattan plan,” which required diesel-powered sanitation trucks to transport waste to facilities in New Jersey daily via the George Washington Bridge and the Holland and Lincoln Tunnels.
 

 Prior to implementing the plan, DOS identified and analyzed relevant areas of concern to determine if the plan might have a significant adverse impact on the environment
 
 (see
 
 6 NYCRR 617.7 [c] [1]). One area was the plan’s impact on air quality. Diesel engines emit particulate matter of varying size into the air. Particles measuring 2.5 microns or less in diameter are referred to as “PM2.5”; particles measuring 10 microns or less in diameter are referred to as “PM10.” The finer the particles, the deeper they may penetrate the lungs and contribute to adverse health effects
 
 (see
 
 62 Fed Reg 38652, 38662 [July 18, 1997]).
 

 Pursuant to the Federal Clean Air Act, the Federal Environmental Protection Agency (EPA) promulgates National Ambient Air Quality Standards (NAAQS) for all “criteria” air pollutants, including particulate matter
 
 (see
 
 42 USC § 7409). Prior to 1997, NAAQS were maintained only for PM10. In July 1997, EPA updated the existing PM10 standards and established NAAQS for PM2.5 (62 Fed Reg 38652 [July 18, 1997], codified at 40 CFR 50.7). Due to inadequate technology and insufficient data to calculate PM2.5 emissions properly, however, EPA issued a memorandum in October 1997 stating that the new standards would not be enforced until 2002 at the earliest. The agency also noted that PM10 NAAQS could be used as a surrogate for PM2.5 in meeting Clean Air Act requirements until the technology and proper data became available.
 

 In 1999, DOS issued a negative declaration for the Manhattan plan, finding it would not have any significant environmental impact requiring a full environmental review or mitigation of any adverse impacts that might occur. DOS evaluated particulate matter using PM10 analysis, rather than PM2.5. The Attorney General commenced this CPLR article 78
 
 *190
 
 proceeding seeking a judgment (1) nullifying and vacating the negative declaration, (2) declaring that DOS’s implementation of the Manhattan plan without first preparing an environmental impact statement was unlawful, and (3) compelling DOS to prepare a draft environmental impact statement and to mitigate all adverse air quality impacts disclosed therein. At issue here is the Attorney General’s contention that the negative declaration was arbitrary and irrational because DOS failed to perform a PM2.5 analysis or identify PM2.5 as a potential environmental concern.
 

 Supreme Court, in a comprehensive decision, dismissed the petition holding that DOS had identified and taken a hard look at the relevant areas of environmental concern. The Appellate Division reversed and granted the petition to the extent of annulling the negative declaration and directed DOS to conduct a new environmental assessment (294 AD2d 257 [2002]). We now reverse.
 

 The State Environmental Quality Review Act (SEQRA) is a legislative attempt to ensure that state and local agencies consider the environmental impact of their proposed actions
 
 (see e.g. Matter of Merson v McNally,
 
 90 NY2d 742, 750 [1997]). By requiring strict adherence to review procedures, the act forces agencies to “strike a balance between social and economic goals and concerns about the environment”
 
 (Matter of Jackson v New York State Urban Dev. Corp.,
 
 67 NY2d 400, 414 [1986]). Under SEQRA, an agency is required to prepare an environmental impact statement (EIS) if it determines that a proposed action “may have a significant effect on the environment” (ECL 8-0109 [2]). If the agency determines that the environmental impact is not significant, it issues a “negative declaration.”
 

 In making its initial determination, the agency will study many of the same concerns that must be assessed in an EIS, including both long- and short-term environmental effects
 
 (see Chinese Staff & Workers Assn. v City of New York,
 
 68 NY2d 359, 364 [1986]). Although the threshold triggering an EIS is relatively low, a “negative declaration is properly issued when the agenc[y] ha[s] made a thorough investigation of the problems involved and reasonably exercised [its] discretion”
 
 (id.).
 
 Thus, a court’s review of that determination is limited to “whether the [agency] identified the relevant areas of environmental concern, took a ‘hard look’ at them, and made a ‘reasoned elaboration’ of the basis for [its] determination”
 
 (id.
 
 at 363-364;
 
 see also Merson,
 
 90 NY2d at 750-751;
 
 Jackson,
 
 67 NY2d at 417).
 

 
 *191
 
 We conclude DOS took the requisite hard look and reasonably concluded the plan would not have a significant impact on air quality. In its negative declaration, DOS evaluated a number of environmental issues, including air quality. To fully assess any potential impact on air quality, DOS studied both particulate matter and carbon monoxide. DOS determined that the diesel trucks required to transport the garbage to New Jersey would emit particulate matter and undertook a comprehensive study to determine whether the particulate matter emissions would have a significant impact on air quality. DOS based its study on the air standards imposed by the Clean Air Act. Although the SEQRA review could have been conducted without reliance on the federal standards, here it was rational for the agency, which is not an expert on air quality, to use such standards in its analysis
 
 (see Chinese Staff,
 
 68 NY2d at 364).
 

 The Attorney General contends that DOS should have examined the effect of PM2.5 emissions. In this case, DOS identified the relevant environmental concern — the impact of the diesel garbage trucks on air quality — and based its study on PM10 emissions. When the negative declaration was issued, there was no technologically feasible methodology to determine the impact of PM2.5 emissions
 
 (see Matter of Mirant Bowline, LLC,
 
 2001 WL 429863,
 
 *
 
 20, 2001 NY Env LEXIS 22,
 
 *
 
 56-58 [NY St Dept Envtl Conservation, Mar. 30, 2001]). Furthermore, EPA had previously determined that PM10 NAAQS could be used as a surrogate to study PM2.5 until new protocols could be calculated and implemented. When DOS issued its negative declaration in 1999, EPA had not yet completed the necessary studies or corrected the technological problems in determining the presence of PM2.5. Based on the scientific information available at that time, DOS rationally conducted a study of particulate matter emissions based on PM10 without further specific reference to PM2.5.*
 

 Accordingly, the order of the Appellate Division should be reversed, with costs, and the petition dismissed.
 

 Chief Judge Kaye and Judges Smith, Ciparick, Rosenblatt, Grapfeo and Read concur.
 

 Order reversed, etc.
 

 *
 

 To the extent there may have been a dispute on whether the agency could determine the impact of PM2.5 emissions in 1999, DOS’s reliance on its expert and EPA’s guidance was rational.