(January 19, 2017)

■ In the Matter of THE FRIENDS OF P.S. 163, INC., et al., Respondents, v JEWISH HOME LIFECARE, MANHATTAN, Appellant, et al., Respondents. In the Matter of DAISY WRIGHT et al., Respondents, v NEW YORK STATE DEPARTMENT OF HEALTH et al., Respondents, and JEWISH HOME LIFECARE, MANHATTAN, Appellant. [46 NYS3d 540]—

Order and judgment (one paper), Supreme Court, New York County (Joan B. Lobis, J.), entered on or about December 18, 2015, which granted the petitions seeking to annul a Findings Statement issued by respondent New York State Department of Health (DOH), dated December 10, 2014, approving respondent Jewish Home Lifecare, Manhattan's (JHL) application to construct a 20-story nursing home facility in Manhattan, and remitted the matter to DOH for preparation of an amended Final Environmental Impact Statement (FEIS) to reconsider the findings on the issues of noise and hazardous materials, reversed, on the law, without costs, the petitions denied, the Findings Statement reinstated, and the proceedings brought pursuant to CPLR article 78 dismissed.

It is axiomatic that judicial review of an agency determination under the State Environmental Quality Review Act (SEQRA) is limited to whether the agency procedures were lawful and "whether the agency identified the relevant areas of environmental concern, took a 'hard look' at them, and made a 'reasoned elaboration' of the basis for its determination" (*Matter of Jackson v New York State Urban Dev. Corp.*, 67 NY2d 400, 417 [1986], quoting *Aldrich v Pattison*, 107 AD2d 258, 265 [2d Dept 1985]; *Matter of Chinese Staff & Workers' Assn. v Burden*, 19 NY3d 922, 924 [2012]). Moreover, "[i]t is not the province of the courts to second-guess thoughtful agency decisionmaking and, accordingly, an agency decision should be annulled only if it is arbitrary, capricious or unsupported by the evidence" (*Matter of Riverkeeper, Inc. v Planning Bd. of Town of Southeast*, 9 NY3d 219, 232 [2007]). Since it is the responsibility of the agency to analyze reports and other documents submitted to it, "it is not for a reviewing court to duplicate these efforts. As we have repeatedly stated, '[w]hile judicial review must be meaningful, the courts may not substitute their judgment for that of the agency for it is not their role to "weigh the desirability of any action or [to] choose among alternatives" ' " (*id.*, quoting *Akpan v Koch*, 75 NY2d 561, 570 [1990], quoting *Jackson*, 67 NY2d at 416). Thus, the court's province is to "assure that the agency itself has satisfied SEQRA, procedurally and substantively" (*Matter of Jackson*, 67 NY2d at 416; *Matter of East End Prop. Co. #1, LLC v Kessel*, 46 AD3d 817, 820 [2d Dept 2007], *lv denied* 10 NY3d 926 [2008]). In this regard, "[d]issatisfaction with an agency's proposed mitigation measures is not redressable by the courts so long as those measures have a rational basis in the record" (*Matter of Jackson*, 67 NY2d at 421).

"An agency's compliance with its substantive SEQRA obligations is governed by a rule of reason and the extent to which particular environmental factors are to be considered varies in accordance with the circumstances and nature of particular proposals" (*Akpan v Koch*, 75 NY2d at 570, citing *Jackson*, 67 NY2d at 417; *Matter of Gernatt Asphalt Prods. v Town of Sardinia*, 87 NY2d 668, 688 [1996]; *Matter of Town of Dryden v Tompkins County Bd. of Representatives*, 78 NY2d 331, 333-334 [1991]). Where "there has been such a reasonable consideration of alternatives, the judicial inquiry is at an end" (*id.* at 334). "Thus the general substantive policy of the act is a flexible one. It leaves room for a reasonable exercise of discretion and does not require particular substantive results in particular problematic instances" (*Coalition Against Lincoln W. v City of New York*, 94 AD2d 483, 492 [1st Dept 1983], *affd* 60 NY2d 805 [1983]).

Furthermore, not every conceivable environmental impact, mitigating measure or alternative must be addressed. "What must be required is that information be considered which would permit a reasoned conclusion" (*id.*; *see also Matter of Residents for Reasonable Dev. v City of New York*, 128 AD3d 609, 610-611 [1st Dept 2015]; *Matter of C/S 12th Ave. LLC v City of New York*, 32 AD3d 1, 7 [1st Dept 2006]). "So long as the officials and agencies have taken [a] 'hard look' at environmental consequences . . . the court does not seek to impose unreasonable extremes or to interject itself within the area of discretion of the executive as to the choice of the action to be taken" (*Natural Resources Defense Council, Inc. v Morton*, 458 F2d 827, 838 [DC Cir 1972] [footnote omitted]).

In arriving at its conclusions, "[a]n agency may rely on consultants to conduct the analyses that support their environmental review of proposed projects. The choice between conflicting expert testimony rests in the discretion of the administrative agency" (*Matter of Brooklyn Bridge Park Legal Defense Fund, Inc. v New York State Urban Dev. Corp.*, 50 AD3d 1029, 1031 [2d Dept 2008], *lv denied* 10 NY3d 714 [2008] [citations omitted]; *Matter of DeFeo v Zoning Bd. of Appeals of Town of Bedford*, 137 AD3d 1123, 1127 [2d Dept 2016]; *Matter of Thorne v Village of Millbrook Planning Bd.*, 83 AD3d 723, 725-726 [2d Dept 2011], *lv denied* 17 NY3d 711 [2011]).

Here, the motion court determined that DOH took a "hard look" at the issues raised by petitioners with the exception of two areas of concern: noise mitigation and off-site migration of lead-bearing dust.

We find that DOH's determination was not arbitrary and capricious or unsupported by the evidence (*see Akpan v Koch*, 75 NY2d at 570). DOH took the requisite "hard look" at the project's anticipated adverse environmental impacts, including noise and hazardous material impacts, and provided a " 'reasoned elaboration' " of its basis for approving the project, including the remedial measures to be employed to mitigate adverse impacts (*Matter of Riverkeeper*, 9 NY3d at 231-232, quoting *Matter of Jackson*, 67 NY2d at 417).

With respect to petitioners' objection that the window air conditioning units proposed as an element of noise-mitigating measures at P.S. 163 would not supply adequate fresh air, it was not unreasonable for DOH to rely on a type of ventilation already in wide use at the school. DOH also rationally rejected, as unreasonably expensive and time-consuming, petitioners' request that central air conditioning be installed at the school. The rough cost estimate for such installation obtained by DOH,

though far from the result of a detailed study on its feasibility, complied with 6 NYCRR 617.9 (b) (5) (v), which requires consideration of "the range of reasonable alternatives to the action that are feasible, considering the objectives and capabilities of the project sponsor."

Significantly, the record is clear that the air conditioning units were not the only noise mitigation measure required by DOH. It also mandated, among other things, the installation of new acoustical windows on the side of the school facing the project site.* As noted above, the mere fact that DOH did not accept or specifically address in the FEIS all the conclusions and recommendations of petitioners' experts with respect to the issue is not tantamount to a failure to take a "hard look" at this issue (*Matter of Brooklyn Bridge Park Legal Defense Fund*, 50 AD3d at 1030-1031; *Coalition Against Lincoln W.*, 94 AD2d at 492).

Moreover, DOH is entitled to rely on the accepted methodology set forth in the City Environmental Quality Review Technical Manual (CEQRTM) with respect to the allowable temporal duration of elevated noise from construction in making its determination (*see Matter of Finn v City of New York*, 141 AD3d 436 [1st Dept 2016], *lv denied* 28 NY3d 906 [2016]; *see also Matter of Chinese Staff*, 88 AD3d at 429). DOH determined that noise levels would exceed the CEQRTM impact criteria in classrooms along the school's eastern facade facing the construction site for a total of 14 months. However, the manual also provides that such increased noise levels inside the school would not constitute a significant adverse impact if those levels lasted less than two years. DOH also found that the combination of replacement acoustical windows and air conditioning units is estimated to reduce noise levels by 25-30 dBA during the same period of time.

"SEQRA requires an agency 'to list ways in which any adverse effects . . . might be minimized' (ECL 8-0109 [2]), but it does not require an agency to impose every conceivable mitigation measure, or any particular one. Rather, in accordance with its balancing philosophy, SEQRA requires the imposition of mitigation measures only 'to the maximum extent

---

* Respondent was also required by DOH to increase the noise barrier facing the school to 16 feet, double the standard height. It further required respondent to place noisy machinery away from the school, to use less noisy electrical equipment, to ensure that the noisiest work does not take place during the yearly testing period and to make available a construction manager to liaise with P.S. 163 to address any issues as they arise during the construction project.

practicable' 'consistent with social, economic and other essential considerations' (ECL 8-0109 [8])" (*Matter of Jackson*, 67 NY2d at 421-422).

Thus, although petitioners, the motion court and the dissent do not agree with DOH's findings, the record supports the conclusion that DOH took the requisite "hard look" at this issue.

The record also reflects that DOH took the requisite "hard look" at the issue of containment of hazardous dust from the construction site. While it is true that DOH conceded that there is a controversy over whether any level of exposure to lead dust is acceptable, it can base its determination as to mitigating measures on currently accepted federal and state mitigating measures. In that respect, DOH reviewed soil sampling from the proposed construction site. It found that 38 samples contained lead levels of 290 parts per million (PPM), and three contained levels of over 1,000 PPM. The threshold for child play areas, as per the National Ambient Air Quality Standards, is 400 PPM. As a result, DOH mandated certain remedial measures, including a two-foot cap of clean soil over any ground left exposed after construction and dust control measures including watering of the soil during demolition, excavation, and soil transport to minimize airborne dust.

Although some of the petitioners contend that DOH failed to perform adequate soil sampling, even the motion court determined that DOH conducted a "comprehensive and detailed investigation."

As with the noise mitigation issue, petitioners argue that the reports of their experts as to proposed mitigation measures were not adequately addressed or considered, and that DOH should have set forth measures to prevent, not merely mitigate, migration of lead dust from the project site. Of course, mitigation of adverse environmental impacts is the mandate of SEQRA (ECL 8-0109 [2] [f]). Petitioners' argument again ignores well settled precedent, which bears repeating, that the mere fact that an agency accepts its own consultants' recommendations over those of petitioners while not specifically addressing all the conclusions and recommendations of petitioners' consultants does not mean that the agency failed to take a "hard look" at a particular issue (*Matter of Brooklyn Bridge Park Legal Defense Fund*, 50 AD3d at 1031; *Coalition Against Lincoln W.*, 94 AD2d at 492).

DOH reasonably relied on federal standards, including National Ambient Air Quality Standards, in determining what measures to employ to mitigate the possibility of off-site migra-

tion of lead-bearing dust (*see Matter of Spitzer v Farrell*, 100 NY2d 186, 191 [2003]). Its mitigation measures reflect its considered judgment and meets the required "hard look" under SEQRA.

In short, we find that the motion court erroneously "substituted its analysis for the expertise of the lead agency" simply because the agency rejected what the court considered to be better measures in mitigation (*Matter of South Bronx Clean Air Coalition v New York State Dept. of Transp.*, 218 AD2d 520, 522 [1st Dept 1995], *lv denied* 87 NY2d 803 [1995], citing *Coalition Against Lincoln W.*, 94 AD2d 483).

We have considered petitioners' remaining arguments, including its contention that JHL has no right to appeal, and find them unavailing. Concur—Friedman, J.P., Sweeny and Webber, JJ.

Gesmer, J., dissents in a memorandum as follows: I respectfully dissent, and would affirm the motion court's order and judgment, subject to a small procedural modification.

The Department of Health (DOH) approved a proposal by respondent Jewish Home Lifecare, Manhattan (JHL) to construct a nursing home in Manhattan (the project). Petitioners challenged the approval as arbitrary and capricious and inconsistent with DOH's obligations under the State Environmental Quality Review Act (SEQRA) to take an in-depth look at the environmental consequences of the project. The motion court rejected petitioners' procedural challenge but found that DOH had failed to comply with the substantive requirements of SEQRA with regard to two issues. Specifically, it found that DOH had failed to take the required "hard look" at the environmental effects of, and appropriate mitigation measures for, the noise and the lead-containing airborne dust particles that would be generated during the construction of the project, and failed to provide a reasoned explanation for its findings. Accordingly, the motion court granted the petitions to the extent of vacating DOH's approval of JHL's application and remitting the matter to DOH for the preparation of an amended Final Environmental Impact Statement (FEIS) to reconsider its findings on the issues of noise and hazardous materials.

In reaching this result, the motion court applied the appropriate deferential standard of review. Accordingly, I would affirm the motion court's findings. However, SEQRA does not use the term "amended FEIS," but rather requires an agency to issue a Supplemental Environmental Impact Statement (SEIS) where the initial FEIS is inadequate (6 NYCRR 617.9 [a] [7]). Accordingly, I would modify the order and judgment only to the extent of directing DOH to issue a SEIS "limited to

the specific significant adverse environmental impacts not addressed or inadequately addressed" in the FEIS (6 NYCRR 617.9 [a] [7]).

In reaching this result, I would find that the motion court properly applied the statutory standard of review. "The primary purpose of SEQRA is 'to inject environmental considerations directly into governmental decision making' " (*Akpan v Koch*, 75 NY2d 561, 569 [1990], quoting *Matter of Coca-Cola Bottling Co. of N.Y. v Board of Estimate of City of N.Y.*, 72 NY2d 674, 679 [1988]). "By requiring strict adherence to review procedures, the act forces agencies to 'strike a balance between social and economic goals and concerns about the environment' " (*Matter of Spitzer v Farrell*, 100 NY2d 186, 190 [2003], quoting *Matter of Jackson v New York State Urban Dev. Corp.*, 67 NY2d 400, 414 [1986]). In reviewing an environmental impact statement under SEQRA, we may "first, review the agency procedures to determine whether they were lawful. Second, we may review the record to determine whether the agency identified the relevant areas of environmental concern, took a 'hard look' at them, and made a 'reasoned elaboration' of the basis for its determination. Court review, while supervisory only, insures that the agencies will honor their mandate regarding environmental protection by complying strictly with prescribed procedures and giving reasoned consideration to all pertinent issues revealed in the process" (*Matter of Jackson*, 67 NY2d at 417 [citations omitted]). I would find that, since the agency did not take the required "hard look" and did not make the required "reasoned elaboration," its action was arbitrary and capricious in these two areas and that therefore the matter must be remanded to the agency for further proceedings. In addition, it is my view that the reversal of the motion court is inconsistent with our obligation to insure that agencies honor their mandate to protect the environment.

## Noise

The project is directly adjacent to elementary school P.S. 163. P.S. 163 has classes from prekindergarten through fifth grade, and serves approximately 600 students between the ages of 3 and 11, including students with special needs. At least 14% of the students have a learning disability. At every opportunity for public comment on the project, petitioners Friends of P.S. 163 (Friends) and individual parents raised questions about the noise that would be generated by the Project, and the effect on the children.

DOH issued a Draft Environmental Impact Statement (DEIS) on March 21, 2014 that concluded that the project "would not result in any significant adverse noise impacts."

Friends retained a group of pediatric environmental health experts at the Mount Sinai Children's Environmental Health Center to comment on the DEIS. They submitted a comment stating that studies have shown that "chronic exposure to increased background noise results in impaired reading comprehension" for average schoolchildren, and recommending that ambient noise levels for children with normal speech processing be no more than between 28.5 and 40 dBA, depending on the age group, and, for young children with delayed speech processing, no more than 21.5 dBA. They concluded that "the predicted noise levels during the noisiest 14 months of construction . . . are predicted to be loud enough to potentially interfere with the wellness and the ability to learn of the school children at P.S. 163," and that "the mitigation measures as outlined in the EIS may not be sufficient to fully prevent negative impacts on P.S. 163 students."

Friends also retained an acoustical engineer to review the DEIS and conduct acoustical testing. In his comments submitted on May 19, 2014, the engineer stated that "additional construction noise mitigation measures must include . . . installation of a central air conditioning HVAC system" on the eastern facade of P.S. 163. One month later, after learning that DOH was considering requiring the installation of new windows on the east side of P.S. 163, he submitted additional comments, which explained that the installation of new windows without central air conditioning would be insufficient to reduce construction noise to acceptable levels because the unregulated heating system and inadequate window air conditioners at P.S. 163 result in windows being left open "virtually every day of the academic year." Friends and individual parents submitted comparable comments.

In the FEIS, DOH provided that JHL would install new acoustical windows along the eastern facade of P.S. 163 and provide new window air conditioning units in each of the eastern facade classroom windows without a functioning unit.[1] These were among the considerations that led to DOH's approval of the project.

However, DOH concluded that, even with these measures in place, for 9 consecutive and 14 total months of excavation and foundation work, interior noise levels at P.S. 163 would exceed 50 dBA. That is above the level of 45 dBA, which, according to

1. In addition, it is not clear whether JHL's agreement to install window air conditioning units in "classrooms" would extend to the school's auditorium, which faces the construction site, has no air conditioning, and is used for classes throughout the school day.

the City Environmental Quality Review (CEQR) Technical Manual,[2] is the level above which indoor noise achieves a nuisance level, especially for sensitive populations such as children.

With regard to noise, the motion court found that DOH did not adequately address the adverse effects of the elevated noise levels during construction on the learning abilities and school performance of the children at P.S. 163. In reaching this conclusion, the motion court took particular note of four factors: (1) the close proximity of the school to the construction site; (2) DOH's finding that CEQR Technical Manual noise level standards would be exceeded during 9 consecutive and 14 total months of excavation and foundation work, even with DOH's proposed mitigation measures, including installation of window air conditioners and acoustical windows in some classrooms; (3) DOH's exclusive reliance on the CEQR guidelines, even though those guidelines do not address the special circumstances of proximity of a noisy construction site to young children; and (4) DOH's failure to take a sufficiently hard look at additional noise mitigation measures, including the installation of a central air conditioning system at P.S. 163.

This conclusion by the motion court is based on its review of the record, pursuant to the standard of review set forth above, and therefore, I would affirm it. The majority, in reversing the motion court, does not fully address the first three of the factors that the motion court considered with respect to noise. While the majority does address the last issue, I disagree with its analysis for the reasons set forth below.

First, the majority states that "it was not unreasonable for DOH to rely on a type of ventilation [window air conditioners] already in wide use at the school." However, the suitability of window air conditioners for ventilation under normal circumstances is entirely irrelevant as to whether they are an appropriate method of noise mitigation. Moreover, DOH failed to respond to the timely comment by petitioner's acoustical engineer that the window air conditioners at P.S. 163 should be removed and replaced with a central HVAC system. As a result, it is not clear why it was reasonable for DOH to rely on the existing window air conditioners to mitigate noise.

Finally, the majority claims that it was rational for DOH to reject central air conditioning as "expensive and time-consuming." However, DOH did not even address in the FEIS,

---

2. According to the FEIS, DOH generally used the 2012 CEQR Technical Manual, 2012 edition, revised June 5, 2013 "as a guide with respect to environmental analysis methodologies and impact criteria for evaluating the effects of the Proposed Project, unless . . . determined otherwise."

much less reject, the proposal by Friends' acoustical engineer regarding central air conditioning; rather, it addressed it for the first time in the Findings, issued one month later. The Findings stated that central air conditioning would be "very difficult, would take a great amount of time and would be extremely costly" and was therefore "infeasible." Although the Findings claimed to base this conclusion on consultation with the New York School Construction Authority (NYSCA), DOH has not produced any evidence that it received any written communications from NYSCA before issuance of the FEIS concerning central air conditioning. Indeed, the written communication from NYSCA that DOH has identified as the basis for its conclusion is email correspondence from NYSCA to petitioners' counsel containing a "very rough estimate" of the cost of installing central air conditioning at P.S. 163 and a statement that the "consensus is that this will be very difficult, will take a great amount of time and is extremely costly." Moreover, the record shows that DOH first saw that email one week after issuance of the FEIS.[3] Certainly, the motion court could have reasonably concluded that this was not the "hard look" or "reasoned elaboration" called for by SEQRA.

Accordingly, I would affirm the motion court's finding that DOH failed to take a sufficiently hard look at, and failed to make a reasoned elaboration of the basis for its determination as to, the issue of noise as it may affect the students at P.S. 163, and appropriate noise mitigation measures.

### Lead

At every opportunity for public comment on the project, Friends, individual parents, and community members raised questions about airborne toxic substances that would be generated by the project, and the effect on the children.

On the issue of airborne toxic substances, the DEIS stated that the project would disturb soil containing hazardous materials, but, with the implementation of a Remedial Action Plan (RAP) and Construction Health and Safety Plan (CHASP) approved by DOH, "significant adverse impacts related to hazardous materials would not be expected."

During the comment period, petitioners submitted comments highlighting the high levels of lead and the adverse impact it would have on the children nearby. The Environmental Technology Group, an environmental and engineering consult-

---

**3.** It is therefore difficult to understand how JHL could claim in its reply brief that DOH "relied heavily" on the opinion and expertise of NYSCA as to central air conditioning when there is no evidence that it received NYSCA's "very rough cost estimate" until after DOH issued the FEIS.

ing group retained by Friends, submitted comments stating that "an enclosed area tent should be utilized during excavation to prevent any particles and odors from emanating from the site."

With regard to this issue, the FEIS stated that (1) lead is present in the soil tested from the project site; (2) construction excavation "can create airborne dust . . . that must be appropriately contained to prevent or minimize inhalation or ingestion" of lead; (3) lead exposure places young children at particular risk of long-lasting damage, including learning and behavioral difficulties; (4) "there is controversy as to whether there is any level of lead exposure that can be considered 'safe' "; and (5) there is no reliable technology for real-time measurement of airborne lead. DOH further stated that the RAP and CHASP it had approved would minimize the impact of the soil disturbance. The RAP and CHASP require wetting of exposed soils, covering trucks with tarpaulins, and air monitoring for small particles, and that construction workers on the project be provided with Tyvek suits, full face monitors and respirators. In the sections of the FEIS concerning hazardous substances and construction, DOH does not discuss the potential effects of any of the substances on the children attending P.S. 163.

Despite the acknowledged uncertainties about safe lead levels and the impossibility of accurately measuring airborne lead levels, DOH concluded that there is no significant threat to public health, and that the CHASP and RAP will be adequate to ensure that lead levels will not exceed the National Ambient Air Quality Standards (NAAQS) of 150 parts per million (ppm). In the FEIS, DOH only explicitly responded to the comments made by petitioners' experts concerning lead by stating that use of a tent was "not warranted" and that the RAP and CHASP would be sufficient to address any problems arising from soil disturbance.

The petitions submitted by the Wright petitioners were accompanied by affidavits by three experts who had reviewed the FEIS and explained that it did not adequately address the environmental effects of toxins and the possible methods to mitigate them. Paul Bartlett, an expert on the emission of toxics, stated that the FEIS estimates of exposure from toxics is incorrect; that the proposed air monitoring is inadequate; and therefore, that "[t]oxics are present at the site at levels of sufficient concern that a sealed tent protocol with negative air pressure and continuous air monitoring is needed to contain the toxics and prevent exposure." Dr. David Carpenter stated

that lead dust has a toxic and irreversible effect on children; that children should be protected from exposure to lead by preventing migration of contaminants off-site; that soil wetting and air monitoring are not sufficient to accomplish this; and that migration of the dust must be ensured by means of a full containment system. An affidavit containing a similar opinion was submitted by toxicologist Stephen Lester.

After applying the appropriate standard of review to the facts before it, the motion court found that, in light of DOH's own acknowledgment of the controversy as to whether there is any safe level of lead exposure, and the close proximity of the construction site to the school, DOH had failed to take "a hard enough look at all relevant mitigation measures or made a reasoned elaboration for its failure to consider containment measures," including tenting.[4]

The majority dismisses this finding, and merely concludes that DOH "reasonably relied on federal standards . . . in determining what measures to employ to mitigate the possibility of off-site migration of lead-bearing dust." However, that statement is not supported by the record, since the chapter of the FEIS that addresses mitigation does not even mention the effects of migration of lead-bearing dust. Moreover, the majority fails to acknowledge that DOH failed to comply with the CEQR Technical Manual, which requires, for example, that a public health analysis consider the potential for exposure to contamination by vulnerable populations, including children. A striking example of its failure to do so is that the RAP requires that, under the circumstances, construction workers wear protective clothing but there is no comparable protection for the children attending school next to the construction site.

Accordingly, I would vote to affirm the motion court's findings, and to modify its order and judgment only to the extent of requiring that DOH adopt a SEIS, rather than an "amended FEIS."

---

4. Thus, respondent JHL is wrong in stating in its brief that the motion court "accept[ed] the demand of petitioners that a tent be included as a mitigation measure." Rather, the motion court said that DOH failed to take a "hard look" at all "relevant mitigation measures," including containment.