This opinion is uncorrected and subject to revision before publication in the New York Reports.
--------------------------------------------------------------------

No. 128
In the Matter of The Friends of
P.S. 163, Inc., et al.,
            Appellants,
        v.
Jewish Home Lifecare, Manhattan,
            Respondent,
New York State Department of
Health, et al.,
            Respondents.
--------------------------------
In the Matter of Daisy Wright,
et al.,
            Appellants,
        v.
New York State Department of
Health, et al.,
            Respondents,
Jewish Home Lifecare, Manhattan,
            Respondent.


        Matthew R. Shahabian, for appellants Friends of P.S.
163, Inc., et al.
        John R. Low-Beer, for appellants Wright, et al.
        Ester Murdukhayeva, for respondents New York State
Department of Health, et al.
        Henry M. Greenberg, for respondent Jewish Home
Lifecare, Manhattan.
        The Real Estate Board of New York, Inc.; CaringKind, et
al.; Services & Advocacy for Gay, Lesbian, Bisexual & Transgender
Elders et al.; City of New York; Gale Brewer, et al.; Cardozo Bet
Tzedek Legal Services et al.; American Academy of Pediatrics, New
York Chapters 2 & 3, et al., amici curiae.

RIVERA, J.:

Petitioners in these two article 78 proceedings
challenge a New York State Environmental Quality Review Act
(SEQRA) assessment by the New York State Department of Health
(DOH) of Jewish Home Lifecare's (JHL) application to construct a

new residential facility in New York City.  Petitioners are, respectively, parents of students attending a public elementary school next door to the proposed construction site and tenants living in apartment buildings surrounding the site.

We reject petitioners' arguments and hold that DOH complied with its SEQRA responsibilities.  It identified and assessed relevant environmental hazards, and, as the agency deemed necessary, imposed mitigation measures to protect public health and safety.  Therefore, we affirm the order of the Appellate Division.

## I. STATUTORY AND REGULATORY SEQRA PROCESS

In New York State, "SEQRA makes environmental protection a concern of every agency" (Matter of Jackson v New York State Urban Dev. Corp., 67 NY2d 400, 414 [1986], citing Environmental Conservation Law § 8-0103 [8] and 6 NYCRR § 617.1 [b]).  Any construction project that requires state agency approval, such as the construction of a nursing home (see Public Health Law § 2802), "which may have a significant effect on the environment," must go through a full SEQRA assessment to make sure that it is undertaken in a way that minimizes damage to the environment and public health (see Environmental Conservation Law § 8-0109 [1]).  To that end, the agency must prepare an Environmental Impact Statement (EIS) that complies with both the substantive and procedural requirements of SEQRA and all other

applicable regulations (see Environmental Conservation Law § 8-0109 [2], 6 NYCRR §§ 617-618). This "insures that agency decision-makers -- enlightened by public comment where appropriate -- will identify and focus attention on any environmental impact of proposed action, that they will balance those consequences against other relevant social and economic considerations, minimize adverse environmental effects to the maximum extent practicable, and then articulate the bases for their choices" (Matter of Jackson, 67 NY2d at 414-415).

After the agency initially determines that it must prepare an EIS, SEQRA review proceeds through several steps. First, the project sponsor or the lead state agency on the project may conduct an optional "scoping session," exploring the method to be used in assessing the project's environmental impact (see 6 NYCRR § 617.8).[1] Next, the lead agency must prepare or cause to be prepared a Draft Environmental Impact Statement (DEIS), to be filed with the Department of Environmental Conservation, which surveys the relevant environmental risks posed by the proposed project (Environmental Conservation Law § 8-0109; 6 NYCRR § 617.12 [b] [6]). After the DEIS has been finished and publicly reviewed, the agency prepares and files a Final Environmental Impact Statement (FEIS) (Environmental

---

[1] The "lead agency" is the agency "having principal responsibility for carrying out or approving [the] action [under review]" (Environmental Conservation Law § 8-0111 [6]).

Conservation Law § 8-0109 [6]).  The DEIS and FEIS must analyze "the environmental impact and any unavoidable adverse environmental effects" of the project under review, as well as "alternatives to the proposed action . . . including a 'no-action alternative,' . . . and mitigation measures" (Matter of Jackson, 67 NY2d at 416 [internal citations omitted]).  Finally, before approving the project, the agency must "make an explicit finding that the requirements of [SEQRA] have been met and that[,] consistent with social, economic[,] and other essential considerations, to the maximum extent practicable, adverse environmental effects revealed in the environmental impact statement process will be minimized or avoided" (Environmental Conservation Law § 8-0109 [8]).  By administrative regulation, such finding must be contained in a written Findings Statement, which considers the conclusions reached in the FEIS, weighs and balances the relevant environmental impacts, and "provide[s] a rationale for the agency's decision" (6 NYCRR §§ 617.11 [c], [d]).

Opportunity for public participation and engagement is an essential and mandatory part of the SEQRA process.  At each step, the agency must provide for public comment, usually through a written public comment period (see 6 NYCRR §§ 617.8 [e], 617.9 [a] [2]-[5], 617.11 [a], [b]; see generally Matter of Jackson, 67 NY2d at 415-416 [summarizing SEQRA process, including public comment requirements]).  The agency is further authorized to hold

optional public hearings at its discretion (see Environmental Conservation Law § 8-0109 [5]; 6 NYCRR §§ 617.8 [e], 617.9 [a] [4]).

## II. DEPARTMENT OF HEALTH'S SEQRA REVIEW OF JHL's CONSTRUCTION PROJECT

In the appeal before us, JHL applied to DOH for permission to construct a new 414-bed residence for the elderly and disabled on a vacant lot on West 97th Street in New York City, to replace JHL's existing, outdated facility several blocks away.  JHL submitted an Environmental Assessment Statement to DOH, triggering the SEQRA review process.  DOH assumed the SEQRA lead agency role, and subsequently issued a notice of intent to prepare a DEIS.  As provided in DOH's final scoping document, the DEIS analyzed, among other environmental matters, the potential impact on public health of exposure to hazardous materials, including soil-based lead and airborne lead dust, as well as the effects of construction noise.  To address these and other concerns, the agency developed a Remedial Action Plan (RAP) and Construction Health and Safety Plan (CHASP), which outlined measures to protect workers and the surrounding community during the construction.

With respect to hazardous materials, the DEIS incorporated the results of two separate environmental site assessments, conducted by different experts.  The first, a Phase I assessment, found "no evidence of recognized environmental

conditions" and recommended no further action.  Nevertheless, the agency proceeded to a Phase II assessment, which collected and analyzed subsurface soil and groundwater samples from the footprint and immediate vicinity of the proposed facility.  This report concluded that lead levels at the site were no higher than those typically found in urban fill, and were below the Department of Environmental Conservation's Restricted Residential Use Soil Cleanup Objectives, which provides a remediation standard for contaminated land (Environmental Conservation Law § 27-1415; 6 NYCRR § 375-6).

Based on these reports, DOH concluded that any risks posed by lead could be appropriately mitigated.  The DEIS noted that, although lead presented a health hazard, especially to children, there would be no long-term public exposure to lead in the soil, because the excavated leaded dirt would be removed or covered by the new facility, and thus did not constitute a soil-lead hazard as defined by the United States Environmental Protection Agency (EPA).

DOH further considered the risk of airborne lead dust migrating from the construction site.  Since New York State does not have an airborne lead risk standard, DOH relied on the National Ambient Air Quality Standard (NAAQS), a federal standard established by the EPA pursuant to the Clean Air Act (42 USC §§ 7408-7409; 40 CFR Part 50).  The NAAQS sets forth an acceptable lead dust level for "sensitive populations" including children

and the elderly.  To ensure airborne lead dust remains within the NAAQS limits, DOH imposed monitoring and containment measures, including sprinkling/wetting soil with water, requiring tarp covers on haul-trucks, inspecting vehicles before site exit, and cleaning trucks as necessary to prevent dust dispersion.  DOH also required proper disposal of soil in accordance with hazardous waste removal standards, real-time monitoring of dust levels, and the installation of a vapor barrier surrounding the cellar and sidewalls, along with contingency plans in case of additional contamination, including work-cessation if measured airborne particulate matter passed a certain threshold.  DOH concluded in the DEIS that the construction would not cause significant environmental or public health risks from lead dust because these mitigation measures would keep airborne dust below the NAAQS limits, ensuring that acceptable levels would be "rarely (if ever)" exceeded.

DOH similarly assessed construction noise, and initially concluded that it would not significantly impact P.S. 163 students, relying, in part, on criteria set forth in the New York City Environmental Quality Review Technical Manual (City Manual) -- the technical manual developed by the City for use by its agencies.  Nevertheless, DOH conducted an analysis of the potential noise impact on P.S. 163 because the school was a "highly sensitive location."

For its noise study, DOH adopted the Computer Aided

Noise Abatement model, and employed assumptions that exceeded the worst-case scenario baselines referenced in the City Manual. Based on this study, DOH concluded that interior noise levels in the classrooms facing the site would, during the noisiest stages of construction, occasionally exceed the City Manual's target of 45 dBA. Actual noise would be lower, though, based on mitigation measures to be employed by JHL, including moving noisy equipment away from P.S. 163, installing a ten-foot-high sound barrier, and using less noisy electrical equipment. DOH concluded that these measures were sufficient because the external absolute noise levels would be equivalent to those on a heavily trafficked city street, and the excess noise would be sporadic over a less-than-two-year period.

After holding two public hearings following the publication of the DEIS, DOH issued the FEIS, reflecting consideration of points raised during the public hearing process, and responding in detail to public comments. As relevant here, DOH maintained that it had properly considered the risk of children's exposure to lead dust during construction and that the mitigation measures it required were sufficient.[2] DOH rejected requests that the construction site be enclosed in a tent during

---

[2] DOH further noted that the Department of Environmental Conservation had also determined, based on the AKRF soil-sample analysis, that the site did not pose a significant threat to public health and that there was no reason to require lead contamination remediation.

excavation to contain airborne particles, concluding that it was unnecessary, as compliance with the RAP and CHASP would adequately control dust levels, which would be continuously monitored using standard technology to ensure that they remained within acceptable levels.

As for construction noise, DOH decided, in response to public comments, to impose additional mitigation measures to further abate the impact on P.S. 163 students. These included requiring JHL to install interior acoustic windows in classrooms facing the site, to provide window air conditioners for classrooms lacking them so that windows could be closed throughout the construction, and to use a 16-foot rather than 10-foot sound barrier. DOH also prohibited noisy work during annual school testing periods and required JHL to assign a construction manager to respond to noise issues. DOH concluded that these measures would keep the noise in classrooms below 45 dBA most of the time. Although interior noise might occasionally reach the low-50s dBA, when construction was at its most intense, DOH concluded that this level would not have adverse health effects on children, as it is roughly equivalent to the background noise in an office.

In light of the reduction in noise to acceptable levels from these mitigation measures, DOH rejected as unnecessary a request from petitioners that JHL install central air conditioning as an alternative noise reduction tactic. After DOH

filed the FEIS, DOH received additional comments from the P.S. 163 Parent Teacher Association, again requesting the installation of central air. In response, JHL alleged that installing central air conditioning at $8-10 million was cost prohibitive and would delay construction. In support of its claims, JHL relied on an email from the City School Construction Authority. The State Dormitory Authority subsequently advised DOH that it was not feasible to install central air conditioning, noting potential added costs and delays if it became necessary for JHL to undertake asbestos abatement as part of the installation.

DOH eventually issued a Findings Statement that incorporated these arguments, reviewed the FEIS, and discussed the relevant environmental impacts identified and assessed during the SEQRA process. The Findings Statement also explicitly provided that, "consistent with social, economic and other essential factors, and considering the available reasonable alternatives," the project "avoids or minimize[s] adverse environmental effects to the maximum extent practicable . . . by incorporating, as conditions to [DOH's] decision, those mitigation measures [which were] identified as practicable," and provided a rationale for that determination.

### III.  PROCEEDINGS BELOW

Petitioners filed their respective article 78 petitions seeking to annul, vacate and set aside DOH's determination as

arbitrary, capricious, and erroneous. Petitioners alleged that DOH relied on flawed assessment methodologies and failed to adequately mitigate the environmental dangers associated with the construction. Supreme Court partly agreed, vacated and annulled DOH's approval of JHL's application, and remitted the matter to DOH to prepare an amended FEIS. The court held that although DOH followed proper SEQRA procedures, it failed to adequately consider all relevant mitigation measures -- in particular the use of a tent and the installation of central air conditioning.

The Appellate Division reversed, with one Justice dissenting, reinstated the Findings Statement, and dismissed the petitions (146 AD3d 576 [2017]). The court rejected petitioners' SEQRA claims as well as their challenge to JHL's standing to appeal Supreme Court's order. The court concluded that Supreme Court had improperly "substituted its analysis for the expertise of the lead agency simply because the agency rejected what the court considered to be better measures" (id. at 581 [internal quotation marks omitted]). The Appellate Division subsequently granted petitioners leave to appeal.

## IV. PETITIONERS' LEAD, NOISE, AND PROCEDURAL CLAIMS

Judicial review of SEQRA findings "is limited to whether the determination was made in accordance with lawful procedure and whether, substantively, the determination 'was affected by an error of law or was arbitrary and capricious or an

abuse of discretion'" (Akpan v Koch, 75 NY2d 561, 570 [1990],
quoting CPLR 7803 [3]).  This review is deferential for "it is
not the role of the courts to weigh the desirability of any
action or choose among alternatives, but to assure that the
agency itself has satisfied SEQRA, procedurally and
substantively" (Matter of Jackson, 67 NY2d at 416).  Courts
review an agency's substantive obligations "in light of a rule of
reason" (id. at 417).  Importantly:

> "Not every conceivable environmental impact,
> mitigating measure or alternative must be
> identified and addressed before a FEIS will
> satisfy the substantive requirements of
> SEQRA.  The degree of detail with which each
> factor must be discussed obviously will vary
> with the circumstances and nature of the
> proposal. . . . [T]he Legislature in SEQRA
> has left the agencies with considerable
> latitude in evaluating environmental effects
> and choosing among alternatives.  Nothing in
> the law requires an agency to reach a
> particular result on any issue, or permits
> the courts to second-guess the agency's
> choice."

(id. at 417 [internal citations omitted]).  In short, we "'review
the record to determine whether the agency identified the
relevant areas of environmental concern, took a 'hard look' at
them, and made a 'reasoned elaboration' of the basis for its
determination" (Akpan, 75 NY2d at 570 [internal citations
omitted]).

On appeal to this Court, petitioners raise several
substantive and procedural issues.  They challenge DOH's lead
hazard findings, reasserting their arguments below that DOH

adopted a flawed methodology to measure the prevalence of lead at the construction site, failed to fully assess or mitigate the impact of airborne lead dust, and never looked specifically at the danger lead dust posed to children, the elderly, or the infirm.  The parent petitioners additionally challenge DOH's construction noise findings, asserting that DOH's noise mitigation measures do not adequately protect P.S. 163 students. These petitioners also assert procedural challenges, namely that JHL lacked standing to appeal and that the Appellate Division erroneously granted DOH's motion to file an amicus brief while rejecting the petitioners' motion to file a brief in response.

We disagree with petitioners' lead claims, and, based on the record here, we conclude that DOH took the requisite hard look at the potential risk posed by soil-based lead contamination and potential lead dust migration.  Petitioners' claims that DOH's soil-sample evidence was insufficient and resulted in unsupported conclusions about the risk posed by lead at the construction site are without merit.  DOH relied on 38 soil samples, taken and analyzed according to a technically sound methodology by expert consultants.  DOH weighed and resolved the disagreement voiced by the petitioners' experts regarding the consultants' methods and opinions.  DOH's conclusions are based on federal and state standards, including accepted EPA standards, on which the agency was legally allowed to rely.  Petitioners may have preferred DOH to adopt a different standard, but we cannot

say DOH's determination "was affected by an error of law or was arbitrary and capricious or an abuse of discretion" (Akpan, 75 NY2d at 570 [1990] [internal quotation marks omitted]).

Petitioners' challenge to DOH's assessment of lead dust is similarly unavailing.  As the record establishes, DOH relied on detailed investigations by experts, and employed appropriate government standards in assessing the risk of airborne lead.  The DEIS, FEIS, and Findings Statement all explicitly acknowledged and evaluated the risk that construction would disturb leaded soil, creating airborne lead dust.  In assessing how acute a danger the lead dust posed, DOH directly relied on the federal NAAQS for lead exposure, which was a rational choice, particularly as this standard was specifically formulated to protect sensitive populations, like schoolchildren.

Preventing the migration and inhalation of lead dust was one of the environmental risks the agency specifically set out to measure and mitigate in the RAP and CHASP that it adopted. In recognition of the risk, DOH imposed a battery of construction protocols to monitor and contain airborne dust.  DOH reasonably concluded that these mitigation measures were sufficient to ensure that airborne lead levels remained within acceptable NAAQS limits, and explained its assessment fully in the DEIS and FEIS.

Petitioners allege that these measures are insufficient, but their argument is unpersuasive.  They complain that DOH relied on outdated standards, did not conduct a proper

"pathway assessment" to determine how lead dust might affect sensitive populations (including, in particular, the children at P.S. 163), and, in any case, did not do enough to minimize lead exposure.  In fact, as the record clearly shows, DOH relied on appropriate standards and considered precisely the harm petitioners identify.  Petitioners allege that DOH should have more fully considered the use of a sealed tent during construction as a possible mitigation measure.[3]  However, DOH acted squarely within its statutory authority to choose among alternatives when it rejected the tent and adopted the measures it chose instead (see Matter of Jackson, 67 NY2d at 417).

Nor do the worker protection measures that DOH required for construction crews suggest that the dust mitigation measures it adopted were unreasonable, as petitioners argue.  The former are designed to protect workers during periods of direct exposure through potential physical contact with hazardous materials at the construction site, while the latter are aimed at protecting students and residents in the surrounding area from airborne particulate matter.  DOH reasonably concluded that the different situation of these two groups warranted different mitigation measures.

We find petitioners' noise claims similarly

---

[3] As DOH notes, the use of a sealed tent is unusual, generally limited to long-term remediation projects, and, for this reason, its use is not contemplated by the City Manual.

unpersuasive.  DOH conducted a detailed analysis of construction noise, employing assumptions based on reasonable worst case scenarios.  In assessing both the dangers of construction noise and the most appropriate mitigation measures, DOH acted within its "considerable latitude in evaluating environmental effects and choosing among alternatives" (id.).  The fact that petitioners would have preferred different or additional mitigation measures presents a difference of opinion about the best way to address the environmental impacts that the agency, not the courts, must consider and resolve.  In fact, the agency considered the opinions of petitioners' experts and determined that the lower noise levels for which they advocated were "not often achieved in densely-populated urban locations such as NYC."  DOH also considered that its levels did not exceed the City Manual's recommendation.  We conclude, based on all this information, that DOH did not act unreasonably in deciding that the noise levels it sought to maintain were within a permissible range.

Petitioner's procedural challenges are either without merit or unreviewable (see CPLR 5501, 5511).

In sum, DOH took the requisite "'hard look' at [relevant areas of environmental concern] and made a 'reasoned elaboration' of the basis for its determination" (Akpan, 75 NY2d at 570 [internal citations omitted]).  Accordingly, the order of the Appellate Division should be affirmed, with costs, and the

certified question not answered as unnecessary.

*   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *

Order affirmed, with costs, and certified question not answered as unnecessary.  Opinion by Judge Rivera.  Chief Judge DiFiore and Judges Stein, Fahey, Garcia, Wilson and Feinman concur.


Decided December 12, 2017