Matter of Northern Manhattan Is Not for Sale v City of New York (2020 NY Slip Op 04235)





Matter of Northern Manhattan Is Not for Sale v City of New York


2020 NY Slip Op 04235


Decided on July 23, 2020


Appellate Division, First Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on July 23, 2020

Richter, J.P., Kapnick, Webber, Gesmer, Moulton, JJ.


11742 161578/18

[*1] In re Northern Manhattan Is Not for Sale, et al., Petitioners-Respondents,
v
City of New York, Respondent-Appellant. 
207 Street Owner LLC, 410 West 207th Acquisition LLC, Shermans Creek Development Corporation, and Consolidated Edison Company of New York, Inc., 
 The New York Public Library, Astor, Lenox and Tilden Foundations, New York 
 State Senator Robert Jackson, and Member of Congress Adriano Espaillat, Amici Curiae.


James E. Johnson, Corporation Counsel, New York (Scott Shorr of counsel), for appellant.
Sussman & Associates, Goshen (Michael H. Sussman of counsel), for respondents.
Akerman LLP, New York (Richard G. Leland of counsel), for 207 Street Owner 
LLC, 410 West 207th Acquisition LLC, Shermans Creek Development Corporation, and 
Consolidated Edison Company of New York, Inc., amici curiae.
Benjamin Mickle, New York, for The New York Public Library, Astor, Lenox and 
Tilden Foundations, amici curiae.
Law Office of Bonnie H. Walker, PLLC, New York (Bonnie H. Walker of counsel), 
for New York State Senator Robert Jackson and Member of Congress Adriano 
Espaillat, amici curiae.



Order and judgment (one paper), Supreme Court, New York County (Verna L. Saunders, J.), entered December 19, 2019, which granted the petition to annul the New York City Council's resolutions adopting the subject rezoning plan, on the ground that the underlying environmental reviews failed to comply with the requirements of the State Environmental Quality Review Act (SEQRA) (ECL 8-0101 et seq.; 6 NYCRR 617.1 et seq.) and City Environmental Quality Review (CEQR) (43 RCNY 6-01 et seq.; 62 RCNY 5-01 et seq.), unanimously reversed, on the law, the petition denied, and the proceeding brought pursuant to CPLR article 78 dismissed, without costs.
In the spring of 2015, the New York City Economic Development Corporation began a three-and-a-half-year study into the long-term future of the Inwood neighborhood of Manhattan. This study, which included community outreach, bilingual public events, meetings with stakeholder groups, and virtual town halls, resulted in the release in June 2017 of the Inwood NYC Action Plan (the Plan); an updated Plan was released in December 2017. The Plan called for revitalizing Manhattan's Inwood section through rezoning and over $400 million in capital and programmatic investments. Specifically, the Plan called for construction of a new mixed-use building with a new library facility to replace the existing Inwood branch of the New York Public Library, updated and expanded residential zoning with provisions for affordable housing, new waterfront parks, improvements to existing parks and streets, and a new performing arts center. Moreover, to the extent the rezoning proposal would allow for new residential development, the City's Mandatory Inclusionary Housing (MIH) program requires the creation of permanent affordable housing in new residential buildings. The Office of the Deputy Mayor for Housing and Economic Development (DMHED) was designated lead agency for SEQRA/CEQR review (see 6 NYCRR 617.2[v]). The City Council was an "involved agency" for purposes of SEQRA/CEQR review (see 6 NYCRR 617.2[t]).
In August 2017, DMHED released its environmental assessment statement and a positive declaration for the project indicating that there was a potential for adverse environmental impacts due to the project. Thus, DMHED directed that a draft environmental impact statement (DEIS) be prepared. The DEIS was completed in January 2018, and made available for public review [*2]and comment. A series of public hearings followed, and in response to the feedback, the City modified the zoning proposal. As required by SEQRA/CEQR, all public comments became part of the SEQRA/CEQR record.
On June 14, 2018, DMHED issued the 1,100-page Final EIS (FEIS), which addressed 19 impact categories, the potential for adverse impacts, alternatives to the proposed rezoning, and measures for mitigation. The FEIS also included a chapter that provided detailed responses to comments received during the comment period for the DEIS.
On August 2, 2018, the City Council's Subcommittee on Zoning and Franchises voted to approve the zoning proposal, with modifications. On August 3, 2018, DMHED issued technical memorandum (TM) 003, which found that the modifications would not raise any new significant adverse environmental impacts.
On August 8, 2018, the City Council approved the rezoning proposal, as modified. The Council specifically adopted the FEIS and subsequent TMs as the written statement of facts supporting its determination. Additionally, in making its determination, the City Council relied on the CEQR Technical Manual. On October 18, 2018, DMHED issued its statement of SEQRA findings. Based on review of the FEIS and TMs, DMHED found that the expected benefits of the Plan, including mandated affordable housing, provided a rationale for proceeding with the Plan notwithstanding its unavoidable environmental impacts.
The Court of Appeals stated in Matter of Jackson v New York State Urban Dev. Corp., 67 NY2d 400, 414-415 [1986], that
"SEQRA insures that agency decision-makers — enlightened by public comment where appropriate — will identify and focus attention on any environmental impact of proposed action, that they will balance those consequences against other relevant social and economic considerations, minimize adverse environmental effects to the maximum extent practicable, and then articulate the bases for their choices."
The core of SEQRA is the Environmental Impact Statement process. Once the lead agency determines that a proposed action or plan includes "the potential for at least one significant adverse environmental impact," the lead agency is required to produce an EIS (6 NYCRR 617.7[a][1]). "An EIS must assemble relevant and material facts upon which an agency's decision is to be made. It must analyze the significant adverse impacts and evaluate all reasonable alternatives" (6 NYCRR 617.9[b][1]). "EISs should address only those potential significant adverse environmental impacts that can be reasonably anticipated and that have been identified in the scoping process. EISs should not contain more detail than is appropriate considering the nature and magnitude of the proposed action and the significance of its potential impacts" (6 NYCRR 617.9[b][2]).
"It is axiomatic that judicial review of an agency determination under [SEQRA] is limited to whether the agency procedures were lawful and whether the agency identified the relevant areas of environmental concern, took a hard look at them, and made a reasoned elaboration of the basis for its determination" (Matter of Friends of P.S. 163, Inc. v Jewish Home Lifecare Manhattan, 146 AD3d 576, 577 [1st Dept 2017], affd 30 NY3d 416 [2017] quoting Matter of Jackson v New York State Urban Dev. Corp., 67 NY2d at 417 [internal quotation marks omitted]). Moreover, "it is not the role of the courts to weigh the desirability of any action or choose among alternatives, but to assure that the agency itself has satisfied SEQRA, procedurally and substantively" (Matter of Jackson, 67 NY2d at 416).
"An agency's compliance with its substantive SEQRA obligations is governed by a rule of reason and the extent to which particular environmental factors are to be considered varies in accordance with the circumstances and nature of particular proposals" (Akpan v Koch, 75 NY2d 561, 570 [1990]). Moreover, "[n]ot every conceivable environmental impact, mitigating measure or alternative must be identified and addressed before a FEIS will satisfy the substantive requirements of SEQRA" (Aldrich v Pattison, 107 AD2d 258, 266 [2d Dept 1985]). "What must be required is that information be considered which would permit a reasoned conclusion" (Matter of Friends of P.S. 163, 146 AD3d at 578, quoting Coalition Against Lincoln W. v City of New York, 94 AD2d 483, 492 [1st Dept 1983], affd 60 NY2d 805 [1983]). "Thus, the court may [*3]only annul a determination as to the sufficiency of an environmental impact statement and the environmental consequences of the proposed project if it is not rational — if it is arbitrary and capricious or unsupported by substantial evidence'" (Aldrich v Pattison, 107 AD2d at 267, quoting Town of Hempstead v Flacke, 82 AD2d 183, 187 [2d Dept 1981]).
Petitioners commenced this article 78 proceeding in December 2018, seeking an order annulling the Council resolutions adopting the Inwood rezoning plan. Petitioners argued that the City violated SEQRA and CEQR by failing to take a "hard look" at eight issues: (1) impact of rezoning on existing preferential rents and effect on renter displacement; (2) impact on area racial makeup; (3) impact on minority and women-owned businesses (MWBEs); (4) accuracy of prior City FEIS projections on rezoning impacts; (5) impact of loss of the existing Inwood library; (6) impact on emergency response times; (7) cumulative impact of other potential area rezonings, including the adjacent 40-acre MTA railyard; and (8) speculative purchase of residential buildings in the wake of the rezoning. Petitioners also contended that the Council's August 8, 2018 vote adopting the rezoning was contrary to law because it was done prior to DMHED's issuance of its statement of findings on October 18, 2018.
The article 78 court determined that the City did not take a "hard look" at the eight issues raised by petitioners despite the fact that petitioners raised these issues during the public comment period for the DEIS. The court rejected the City's argument that it is not required to identify or address every conceivable environmental impact. The court also found that the City's reliance on the CEQR Technical Manual was misguided because the CEQR manual is a guideline and not a rule or regulation requiring strict compliance.
We find that the City's decision was not arbitrary and capricious, unsupported by the evidence, or contrary to law. The City took the requisite "hard look" at all the issues requiring study under SEQRA/CEQR (Matter of Friends of P.S. 163, Inc. v Jewish Home Lifecare, Manhattan, 30 NY3d 416, 430 [2017]; Matter of Riverkeeper, Inc. v Planning Bd. of Town of Southeast, 9 NY3d 219, 231-232 [2007]), but did not have to parse every sub-issue as framed by petitioners (see Matter of Jackson, 67 NY2d at 420-421). Moreover, the City was "entitled to rely on the accepted methodology set forth in the [CEQR] Technical Manual" (Matter of Friends of P.S. 163, 146 AD3d at 579; see Matter of Chinese Staff & Workers' Assn. v Burden, 88 AD3d 425, 429-430 [1st Dept 2011], affd 19 NY3d 922 [2012]), including in determining what issues were beyond the scope of SEQRA/CEQR review.
To the extent certain issues required a hard look to satisfy SEQRA, the FEIS provided reasoned explanations for the City's actions. For example, the FEIS stated that with regard to direct residential displacement, as none of the projected development sites included any residential units, "no existing residential units would be directly displaced." The FEIS also addressed indirect residential displacement, which required an analysis of the socioeconomic characteristics of the current population, and found that "approximately 83 percent of the rental housing stock is rent regulated and/or subsidized . . . [and that an] estimated 4,500 housing units . . . [were] unprotected by rent regulation." However, due to the shortage of housing in the Inwood neighborhood, these unprotected units were likely already experiencing rent pressures. Under the proposed rezoning, various protections would be instituted to assuage the housing squeeze that Inwood residents were experiencing and would continue to experience without any intervention. Such protections included density caps, implementation and enforcement of the MIH program, and the requirement that new residential developments contain a certain percentage of permanent affordable housing units. Thus, the planned rezoning and new residential developments would likely improve the rental situation, or at least ease the rent pressures that were already in effect.
Although we understand petitioners' desire to require the City to explore the potential impacts on racial and ethnic groups, the City "was not required to perform analysis aimed at forecasting the mix of ethnicities expected to occupy units in the development, and the corresponding impact on prevailing area patterns of racial and ethnic concentration" (Matter of Churches United for Fair Hous., Inc. v De Blasio, 180 AD3d 549, 550 [1st Dept 2020]).
Although the FEIS did not specifically address MWBEs, it did study the direct and indirect displacement of businesses in the rezoning area and found that the "Proposed Actions" [*4]would not result in significant adverse impacts. The City determined that the Plan would broadly promote business development by increasing density and allowing a wider variety of types and uses of several blocks in the study area. Further, the FEIS noted that at least some opportunity for MWBEs would be created because developers of certain City-funded projects were required to spend at least a quarter of costs on MWBEs. In any event, and as argued by the City, pursuant to the CEQR Technical Manual, the characteristics of business ownership are not considered in a CEQR analysis. Thus, the City's decision not to specifically analyze the Plan's impact on area MWBEs was rational and complied with SEQRA/CEQR (Churches United, 180 AD3d at 550; see also Matter of Friends of P.S. 163, 146 AD3d at 579).
With respect to petitioners' remaining points of contention, it was not unreasonable for the City to determine that those issues were beyond the scope of SEQRA/CEQR review pursuant to the CEQR Technical Manual, did not result in a significant adverse impact, or were based on speculation and hypotheticals and therefore did not warrant further review. It bears repeating that, under the controlling precedent, the City "is entitled to rely on the accepted methodology set forth in the [CEQR] Technical Manual" (Matter of Friends of P.S. 163, 146 AD3d at 579, affd 30 NY3d 416 [2017]). To the extent petitioners take umbrage with the limited scope of the SEQRA/CEQR review process, this argument can only be raised to the legislative body that periodically revises the criteria contained in the CEQR Technical Manual. In the meantime, this Court is constrained by the limited standard of review under the statute (id.; see also Matter of Jackson, 67 NY2d at 416-417).
The City Council acted properly, and consistently with SEQRA/CEQR procedures, in approving the rezoning and issuing its own written statement finding that the rezoning avoided or minimized adverse environmental impacts to the maximum extent practicable (see ECL 8-0109[8]; 6 NYCRR 617.11[d][2]-[3]). This is so notwithstanding that the Council acted prior to the lead agency's issuance of its written statement of findings two months later. As an "involved agency" (6 NYCRR 617.2[t]; Troy Sand & Gravel Co., Inc. v Town of Nassau, 125 AD3d 1170, 1172-1173 [3d Dept 2015]), the Council was authorized to engage in its own weighing and balancing of relevant considerations and issue its own statement of findings independent of the lead agency (see Matter of Troy Sand & Gravel Co., Inc. v Fleming, 156 AD3d 1295, 1300 [3d Dept 2017], lv denied 31 NY3d 913 [2018]).
THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: JULY 23, 2020
CLERK