[981 NE2d 766, 958 NYS2d 65]

In the Matter of BRONX COMMITTEE FOR TOXIC FREE SCHOOLS et al., Respondents, v NEW YORK CITY SCHOOL CONSTRUCTION AUTHORITY et al., Appellants.

Argued September 11, 2012; decided October 23, 2012

## POINTS OF COUNSEL

*Michael A. Cardozo, Corporation Counsel*, New York City (*Janet L. Zaleon, Kristin M. Helmers* and *Carrie Noteboom* of counsel), for appellants. The final environmental impact statement demonstrated that compliance with the Brownfield Cleanup Program (BCP) would mitigate the potential adverse

impact of contamination by hazardous materials, and identified the specific environmental controls to be put in place. The BCP regulations require a post-remediation site management plan for long-term maintenance and monitoring of the continued effectiveness of the environmental controls. Thus the New York City School Construction Authority complied with the State Environmental Quality Review Act, so that a supplemental environmental impact statement is unnecessary. (*Akpan v Koch*, 75 NY2d 561; *Matter of Coca-Cola Bottling Co. of N.Y. v Board of Estimate of City of N.Y.*, 72 NY2d 674; *Matter of Develop Don't Destroy [Brooklyn] v Urban Dev. Corp.*, 59 AD3d 312, 13 NY3d 713; *Matter of Riverkeeper, Inc. v Planning Bd. of Town of Southeast*, 9 NY3d 219; *Matter of Jackson v New York State Urban Dev. Corp.*, 67 NY2d 400; *Aldrich v Pattison*, 107 AD2d 258; *Matter of Committee to Preserve Brighton Beach & Manhattan Beach v Planning Commn. of City of N.Y.*, 259 AD2d 26; *Association for Community Reform Now v Bloomberg*, 13 Misc 3d 1209[A], 2006 NY Slip Op 51750[U], 52 AD3d 426, 11 NY3d 707; *Matter of Coalition Against Lincoln W., Inc. v Weinshall*, 21 AD3d 215, 5 NY3d 715; *Matter of C/S 12th Ave. LLC v City of New York*, 32 AD3d 1.)

*Weil, Gotshal & Manges, LLP*, New York City (*Gregory Silbert, David Berz* and *Christopher Barraza* of counsel), and *New York Lawyers for the Public Interest* (*Gavin Kearney* and *Dawn Philip* of counsel) for respondents. I. The Appellate Division, and the Supreme Court before it, correctly found that the New York City School Construction Authority's final environmental impact statement (FEIS) was deficient because the School Construction Authority failed to take a hard look at long-term maintenance and monitoring of remediation measures prior to approval of the FEIS. (*Akpan v Koch*, 75 NY2d 561; *Chinese Staff & Workers Assn. v City of New York*, 68 NY2d 359; *Matter of Jackson v New York State Urban Dev. Corp.*, 67 NY2d 400; *Matter of King v Saratoga County Bd. of Supervisors*, 89 NY2d 341; *Matter of Riverkeeper, Inc. v Planning Bd. of Town of Southeast*, 9 NY3d 219; *Matter of Save Southard Rd. Neighborhood Coalition v Town of Saratoga Planning Bd.*, 35 AD3d 1017; *Matter of Merson v McNally*, 90 NY2d 742; *Matter of City Council of City of Watervliet v Town Bd. of Town of Colonie*, 3 NY3d 508; *Matter of Baker v Village of Elmsford*, 70 AD3d 181; *Matter of Di Veronica v Arsenault*, 124 AD2d 442.) II. The Appellate Division properly upheld the Supreme Court's order that the New York City School Construction Authority issue a supplemental environmental impact statement that addresses

long-term maintenance and monitoring of remediation measures for the Mott Haven site. (*Matter of Riverkeeper, Inc. v Planning Bd. of Town of Southeast*, 9 NY3d 219; *Mobil Oil Corp. v City of Syracuse Indus. Dev. Agency*, 224 AD2d 15; *Matter of C/S 12th Ave. LLC v City of New York*, 32 AD3d 1; *Matter of Penfield Panorama Area Community v Town of Penfield Planning Bd.*, 253 AD2d 342; *Matter of Doremus v Town of Oyster Bay*, 274 AD2d 390; *Develop Don't Destroy [Brooklyn], Inc. v Empire State Dev. Corp.*, 33 Misc 3d 330; *Waldbaum, Inc. v Incorporated Vil. of Great Neck*, 10 Misc 3d 1078[A], 2006 NY Slip Op 50119[U].)

*Fried, Frank, Harris, Shriver & Jacobson LLP*, New York City (*Richard G. Leland, Laura Israel Sinrod* and *Deuel Ross* of counsel), and *Sive, Paget & Riesel, P.C.* (*Mark A. Chertok, Jennifer Coghlan* and *Edward K. Roggenkamp, IV*, of counsel) for The Real Estate Board of New York, Inc., amicus curiae. I. The Appellate Division's decision contradicts well-established precedent holding that a lead agency has broad discretion in determining whether a supplement environmental impact statement is warranted. (*Matter of Riverkeeper, Inc. v Planning Bd. of Town of Southeast*, 9 NY3d 219; *Matter of Gaines v New York State Div. of Hous. & Community Renewal*, 90 NY2d 545; *Matter of C/S 12th Ave. LLC v City of New York*, 32 AD3d 1; *Matter of Halperin v City of New Rochelle*, 24 AD3d 768; *Society of Plastics Indus. v County of Suffolk*, 77 NY2d 761; *Glen Head-Glenwood Landing Civic Council v Town of Oyster Bay*, 88 AD2d 484; *Marsh v Oregon Natural Resources Council*, 490 US 360; *Matter of Jackson v New York State Urban Dev. Corp.*, 67 NY2d 400; *Matter of Coalition Against Lincoln W., Inc. v Weinshall*, 21 AD3d 215; *Matter of Molly, Inc. v County of Onondaga*, 2 AD3d 1418.) II. A lead agency need not await completion of Brownfield Cleanup Program remediation and a site management plan before issuing a final environmental impact statement. (*Matter of Long Is. Pine Barrens Socy. v Planning Bd. of Town of Brookhaven*, 78 NY2d 608; *Matter of Riverkeeper, Inc. v Planning Bd. of Town of Southeast*, 9 NY3d 219; *Matter of Penfield Panorama Area Community v Town of Penfield Planning Bd.*, 253 AD2d 342; *Matter of Pyramid Co. of Watertown v Planning Bd. of Town of Watertown*, 24 AD3d 1312.) III. The Appellate Division's decision sets a dangerous precedent and is contrary to public policy. (*Matter of Riverkeeper, Inc. v Planning Bd. of Town of Southeast*, 9 NY3d 219.)

*Schulte Roth & Zabel LLP*, New York City (*Howard B. Epstein, Theodore A. Keyes, Sami B. Groff, Lawrence B. Schnapf*

and *Valerie L. Sheaffer* of counsel), for New Partners for Community Revitalization, amicus curiae. I. The Appellate Division correctly ruled that the final environmental impact statement was deficient because the New York City School Construction Authority failed to take a hard look at long-term maintenance and monitoring related to the institutional and engineering controls. (*Matter of King v Saratoga County Bd. of Supervisors*, 89 NY2d 341; *Williamsburg Around the Bridge Block Assn. v Giuliani*, 223 AD2d 64; *Matter of Coalition Against Lincoln W., Inc. v Weinshall*, 21 AD3d 215; *Matter of Pyramid Co. of Watertown v Planning Bd. of Town of Watertown*, 24 AD3d 1312; *Matter of Penfield Panorama Area Community v Town of Penfield Planning Bd.*, 253 AD2d 342; *Matter of Holmes v Brookhaven Town Planning Bd.*, 137 AD2d 601.) II. The Appellate Division correctly required the New York City School Construction Authority to prepare a supplemental environmental impact statement that addresses the long-term maintenance and monitoring plans for engineering controls. (*Matter of Doremus v Town of Oyster Bay*, 274 AD2d 390.)

**OPINION OF THE COURT**

SMITH, J.

An agency preparing an environmental impact statement (EIS) has broad discretion in deciding what to include and what to omit. We nevertheless hold that in this case the New York City School Construction Authority (Authority) must supplement its EIS to describe certain remedial measures, because the Authority has not challenged petitioners' showing that such a description is essential to an understanding of the environmental impact of the Authority's project.

I

The project is the construction of a campus including four public schools in the Mott Haven area of the Bronx. The site selected by the Authority for the campus was formerly a railroad yard. The soil and ground water were significantly contaminated, and had to be cleaned up.

The process of identifying, analyzing and remedying the site's environmental problems was long and laborious. A first environmental assessment was prepared in 2001; remedial actions were not completed until 2007. In the interval, the Authority prepared many studies, consulted with community groups, repeatedly invited public comment on the project, and complied with a number of statutory requirements not relevant here.

The issue before us is whether the Authority violated the State Environmental Quality Review Act (SEQRA) (ECL 8-0101 *et seq.*) by failing to discuss in an EIS the methods it adopted for long-term maintenance and monitoring of the controls it used to prevent or mitigate environmental harm. To place this issue in context, we must discuss the impact on the project of another statutory scheme, the Brownfield Cleanup Program (ECL 27-1401 *et seq.*), by which the State offers inducements for the cleanup of contaminated sites. The Authority successfully applied to participate in the Brownfield Program before it prepared the EIS required by SEQRA.

The most contaminated section of the Mott Haven campus site was accepted into the Brownfield Program by the Department of Environmental Conservation (DEC) in 2005. Participation in the program required the Authority to submit a number of documents to the DEC, among them a Remedial Action Work Plan (RAWP), describing how it proposed to remedy the contamination. In its RAWP, the Authority proposed, among other things, to make use of so-called engineering controls—for example, a vapor barrier under a school building, to prevent contaminants from entering the school, and a hydraulic barrier to prevent recontamination of the site by groundwater (*see* ECL 27-1405 [11] *and* 6 NYCRR 375-1.2 [o] [defining "engineering control"]).

The Brownfield statute and the DEC regulations implementing it require a RAWP that includes engineering controls also to include, among other things, "a complete description of . . . any operation, maintenance, and monitoring requirements, including the mechanisms that will be used to continually implement, maintain, monitor, and enforce such controls" (ECL 27-1415 [7] [a] [ii]; *see also* 6 NYCRR 375-1.8 [h] [1] [ii]). In other words, a site owner is required to describe the means it will use to be sure that its engineering controls continue to work as intended. These long-term maintenance and monitoring methods, which are the focus of this litigation, include such things as the inspection of structures to be sure they are in good condition, and the periodic testing of groundwater for contaminants.

The RAWP that the Authority submitted to the DEC did not describe its plans for long-term maintenance and monitoring. This was because the Authority believed a choice of maintenance and monitoring methods at that time would be premature. In the Authority's view, such methods are best chosen after cleanup work has been done, and the post-cleanup soil and

groundwater conditions can be assessed. The DEC approved the RAWP on July 5, 2006, stating as a condition, among others, that the Authority "must develop a site management plan for [DEC] approval to . . . provide for the operation and maintenance of the components of the remedy."

After getting DEC's conditional approval of the RAWP, but before preparing the site management plan that the DEC required, the Authority went through the SEQRA process. It prepared a draft EIS, made it available for public comment and revised it in light of those comments. Neither the draft nor the final version of the EIS described the long-term maintenance and monitoring procedures to be used.

After filing the final version of the EIS, the Authority, on November 6, 2006, made detailed findings as to the environmental impacts of the project. It concluded that "[t]he beneficial impacts of the construction of the proposed new school facility far outweigh the adverse environmental impacts," that those impacts "can be largely mitigated" by measures identified in the final EIS, and that the project "minimizes or avoids adverse environmental impacts to the maximum extent practicable by incorporating as conditions to the decision those mitigative measures which were identified as practicable" (see ECL 8-0109 [2], [5], [8]).

Petitioners brought this CPLR article 78 proceeding in 2007, challenging the Authority's SEQRA compliance. Petitioners pointed to several alleged flaws in the EIS, but the only one that now concerns us is its failure to "propose a long-term maintenance and monitoring protocol." An expert affidavit submitted in support of the petition said that "the long-term inspection, maintenance and monitoring of protective controls is essential to ensuring that [the Authority's] strategy will sufficiently protect a site's occupants" and that the strategy outlined by the Authority in its RAWP "can be effective mitigation only if a robust long-term management program is implemented."

In opposing the petition, the Authority did not assert that the methods of long-term maintenance and monitoring were not important enough to be described in an EIS. Rather, the Authority submitted an expert affidavit explaining that "developing a detailed site management plan at this time is neither necessary nor appropriate because the plan must be governed by post-remediation soil and groundwater conditions, something that

cannot be measured until after cleanup is complete." Supreme Court interpreted the Authority's position as an admission "that its final Environmental Impact Statement as it stands now is incomplete without a detailed long term maintenance and monitoring plan" and ordered the Authority to prepare a supplemental EIS "based upon any changes to the final Environmental Impact Statement as a result of the [Authority's] completed, detailed long term maintenance and monitoring plan."

After Supreme Court's decision, the Authority prepared a site management plan that included a description of long-term maintenance and monitoring measures, which the DEC approved in November 2008. Petitioners do not dispute that these measures were adequate; thus, the Authority could presumably have complied with Supreme Court's order and resolved this case simply by filing, in the form of a supplemental EIS, the description of long-term maintenance and monitoring that its site management plan contains. But the Authority did not file a supplemental EIS. Instead, it moved for reargument and renewal, asserting in substance that its submission of the site management plan, and DEC's approval of it, removed the need for any further SEQRA filing.

Supreme Court granted reargument, but upon reargument adhered to its previous ruling. The Appellate Division affirmed both of Supreme Court's orders (*Matter of Bronx Comm. for Toxic Free Schools v New York City School Constr. Auth.*, 86 AD3d 401 [1st Dept 2011]). We granted leave to appeal (17 NY3d 717 [2011]), and now affirm.

## II

SEQRA requires the preparation of an EIS "on any action . . . which may have a significant effect on the environment" (ECL 8-0109 [2]). The EIS must include, among other things, "a description of the proposed action," its "environmental impact" and "mitigation measures proposed to minimize the environmental impact" (*id.* § 8-0109 [2] [a], [b], [f]). In reviewing the sufficiency of an EIS, the role of a court is "to determine whether the agency identified the relevant areas of environmental concern, took a 'hard look' at them, and made a 'reasoned elaboration' of the basis for its determination" (*Matter of Jackson v New York State Urban Dev. Corp.*, 67 NY2d 400, 417 [1986] [citations omitted]).

In essence, the position of petitioners here, and the holding of the courts below, is that the methods chosen by the

Authority for long-term maintenance and monitoring of its engineering controls were too important not to be described in an EIS. We agree, because petitioners' showing as to the importance of these measures stands unrebutted on this record.

We do not view this case as a dispute over how much detail must be included in an EIS, or over whether events occurring after the EIS was filed were significant enough to call for a supplement. If those were the issues, we would defer to any reasonable judgment made by the Authority (*see Matter of Eadie v Town Bd. of Town of N. Greenbush*, 7 NY3d 306, 318-319 [2006]; *Webster Assoc. v Town of Webster*, 59 NY2d 220, 227-229 [1983]). But the Authority does not assert that, in its judgment, the maintenance and monitoring measures were relatively minor details that the public did not need to know about. The Authority has not disputed petitioners' showing that these measures were "essential" to protecting the site's occupants from dangerous contaminants.

The Authority seems instead to be arguing that it should not have to describe the long-term maintenance and monitoring measures in a supplemental EIS because (1) it reasonably chose not to decide on those measures before its EIS was filed and (2) it adequately described them in the site management plan approved by the DEC as part of the Brownfield Program. Both of these arguments lack merit.

We assume, without deciding, that the Authority acted reasonably in postponing a detailed consideration of its long-term maintenance and monitoring measures until after it had completed cleanup work at the site and after its EIS was filed. That does not mean, however, that mitigation measures of undisputed importance may escape the SEQRA process. DEC regulations provide for the filing of a supplemental EIS to address subjects "not addressed or inadequately addressed in the EIS," arising from "changes proposed for the project," from "newly discovered information" or from changed circumstances (6 NYCRR 617.9 [a] [7]). Where important decisions about mitigation can only be made after the initial remedial measures are complete, a supplemental EIS may be called for, as it is here.

Nor does the submission of the site management plan to the DEC, or the approval of that plan as part of the Brownfield process, justify short-circuiting SEQRA review. The Brownfield Program and SEQRA serve related but distinct purposes. SEQRA is designed to assure that the main environmental

concerns, and the measures taken to mitigate them, are described in a publicly filed document identified as an EIS, as to which the public has a statutorily-required period for review and comment. We understand the Authority's view that, as to this project, it has already done enough public outreach and considered enough public comments, but SEQRA requires it to take this one step more.

Accordingly, the order of the Appellate Division should be affirmed, with costs.

READ, J. (concurring). I agree with the result in this appeal in view of the facts and caveats as stated by the majority. But what happened here does, in my view, highlight the uncertainty that lead agencies and developers face when a project reviewable under the State Environmental Quality Review Act (SEQRA) (ECL art 8) is sited on land accepted in whole or in part into the Brownfield Cleanup Program (BCP) (ECL art 27, tit 14).

This assumes, of course, that the developer's remedial activities are not exempt from SEQRA altogether. The regulations governing the Inactive Hazardous Waste Disposal Site Remedial Program (ECL art 27, tit 13), which is akin to the BCP, provide as follows:

> "(b) State environmental quality review act applicability. Remedy selection and implementation of remedial actions under Department approved work plans pursuant to ECL article 27, title 13 are not subject to review pursuant to ECL article 8 and its implementing regulation (6 NYCRR Part 617), as an exempt action pursuant to the enforcement exemption provision" (6 NYCRR 375-2.11 [b]; *see also* ECL 8-0105 [5] [i] [exempting "enforcement proceedings or the exercise of prosecutorial discretion in determining whether or not to institute such proceedings" from SEQRA's definition of "action"]; *Matter of New York Pub. Interest Research Group v Town of Islip*, 71 NY2d 292, 306 [1988] [discussing equivalent provision in former part 617 regulations]).

The analogous provision in the BCP regulations is more complicated:

> "(b) State environmental quality review act applicability.
>
> "(1) Remedy selection and implementation of remedial actions under Department-approved work plans

pursuant to ECL article 27, title 14 are not subject to review pursuant to ECL article 8 and its implementing regulation (6 NYCRR Part 617), provided that design and implementation of the remedy do not:

"(i) commit the Department or any other agency to specific future uses or actions; and

"(ii) prevent evaluation of a reasonable range of alternative future uses of or actions on the remedial site. . . .

"(3) The exemption set forth in this subdivision is in addition to, and not in place of, other exemptions to [sic] that apply pursuant to Parts 617 or 618 of this title (e.g. the enforcement exemption)" (6 NYCRR 375-3.11 [b]).

Respondent in this CPLR article 78 proceeding, the New York City School Construction Authority (the Authority), never claimed that the BCP-related portion of its project was exempt from SEQRA. And perhaps difficulties coordinating BCP and SEQRA review seldom arise because developers routinely qualify for the exemption from SEQRA for remedial activities designed and implemented on the project site pursuant to the BCP.*

Here, petitioner Bronx Committee for Toxic Free Schools complains that the protocols chosen by the Authority for long-term maintenance and monitoring of the remedy should have been discussed in the draft environmental impact statement (EIS) to afford the public the opportunity to comment on them.

---

* I frankly confess, though, that I find 6 NYCRR 375-3.11 (b) confusing. Does the exception from the exemption in paragraph (1) of this provision *only* apply to direct actions (*see* 6 NYCRR 617.2 [k] [defining "direct action" or "directly undertaken action" as "an action planned and proposed for implementation by an agency"])? Certainly, developers seek acceptance into the BCP because they want to redevelop contaminated property for a defined proposed project—a "specific future use[ ] or action[ ]"—which necessarily "prevent[s] evaluation of a reasonable range of alternative future uses of or actions on the remedial site." And what does paragraph (3) mean when it says the exemption in paragraph (1) is *in addition to* the enforcement exemption? This suggests that not all "[r]emedy selection and implementation of remedial actions under Department-approved work plans" under the BCP qualify for the enforcement exemption, contrary to the situation under the Inactive Hazardous Waste Disposal Site Remedial Program (*compare* 6 NYCRR 375-3.11 [b] [3] *with* 6 NYCRR 375-2.11 [b]). But then how does a lead agency or developer know when the enforcement exemption applies and when it does not?

The Legislature, however, has already provided for public comment under the BCP (*see* ECL 27-1417 [3]; *see also Matter of Lighthouse Pointe Prop. Assoc. LLC v New York State Dept. of Envtl. Conservation*, 14 NY3d 161, 166 [2010] ["Public notice and opportunities for citizen participation are integral features of the BCP at every stage, from the request to participate (in the program) to issuance of the certificate" of completion issued by the New York State Department of Environmental Conservation (DEC) once a site has been cleaned up in accordance with applicable remedial requirements]). More specifically,

> "[t]he BCP calls for some degree of public participation in at least seven different stages of the application and cleanup process: when an original application is filed; before finalizing a remedial investigation work plan; before the DEC approves a proposed remedial investigation report; before the agency finalizes a remedial work plan; before the applicant commences construction at a brownfield site; before the DEC approves a final engineering report; and within 10 days of issuance of a certificate of completion" (*see* Dale Desnoyers & Larry Schnapf, *Environmental Remediation Process is Undergoing Sweeping Changes Mandated by New Brownfields Law*, 76 NY St BJ 10, 14 [Oct. 2004]).

The most recent edition of DEC's Citizen Participation Handbook for Remedial Programs provides for a 45-day public comment period for a draft Remedial Action Work Plan (RAWP), with a public meeting if requested in those cases where the site poses a significant threat to human health or the environment (*see* New York State Department of Environmental Conservation, DER-23/Citizen Participation Handbook for Remedial Programs § 3.1 ["Summary of Brownfield Cleanup Program Citizen Participation Requirements"] [Jan. 21, 2010], available at http://www.dec.ny.gov/docs/remediation_hudson_pdf/der23.pdf). As the majority observes, the draft RAWP is supposed to describe "the means [to be used] to be sure that [the proposed remedy's] engineering controls continue to work as intended" (majority op at 153; *see also* ECL 27-1415 [7] [a] [i]-[iv]). The Authority was of the view that, in this case, inclusion of these details in the draft RAWP was premature. Accordingly, DEC conditioned its approval of the RAWP, which occurred prior to the Authority's issuance of a draft EIS, on "develop[ment of] a site management plan for [DEC] approval

to . . . provide for the operation and maintenance of the components of the remedy." If the Authority had addressed long-term maintenance and monitoring in the draft RAWP, which was subject to public review and comment as part of the formal BCP citizen participation program, there presumably would have been no need to cover the same topic separately in the draft EIS. But, as noted previously, it is uncertain how BCP and SEQRA requirements fit together so as to offer meaningful and non-duplicative review of a project. Perhaps DEC will clarify this issue in the context of its proposed SEQRA amendments (*see* Charlotte A. Biblow, *DEC Proposes First Revisions to SE-QRA Regulations Since 1996*, NYLJ, Sept. 27, 2012 at 3; *see also* New York State Department of Environmental Conservation, Draft Scope for the Generic Environmental Impact Statement on the Proposed Amendments to the State Environmental Quality Review Act at 5 [July 11, 2012], available at http://www.dec.ny.gov/docs/permits_ej_operations_pdf/drftscope617.pdf [proposing to add "Brownfield site clean-up agreements under Title 14 of ECL Article 27" to list of actions not requiring review under SEQRA]).

Chief Judge LIPPMAN and Judges CIPARICK, GRAFFEO, PIGOTT and JONES concur with Judge SMITH; Judge READ concurs in result in a separate opinion.

Order affirmed, with costs.