Matter of Boise v City of Plattsburgh (2023 NY Slip Op 04338)

Matter of Boise v City of Plattsburgh

2023 NY Slip Op 04338

Decided on August 17, 2023

Appellate Division, Third Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:August 17, 2023

535097 
[*1]In the Matter of L. David Boise et al., Respondents,
v
City of Plattsburgh et al., Appellants.

Calendar Date:March 31, 2023

Before:Egan Jr., J.P., Clark, Pritzker, Ceresia and Fisher, JJ. 

Law Offices of Dean C. Schneller, Plattsburgh (Dean C. Schneller of counsel), for City of Plattsburgh and others, appellants.
Whiteman Osterman & Hanna LLP, Albany (Christopher M. McDonald of counsel), for Prime Plattsburgh, LLC, appellant.
DuCharme Clark, LLP, Clifton Park (John B. DuCharme of counsel), for respondents.

Pritzker, J.
Appeal from a judgment of the Supreme Court (John T. Ellis, J.), entered February 24, 2022 in Clinton County, which granted petitioners' application, in a combined proceeding pursuant to CPLR article 78 and action for declaratory judgment, to, among other things, annul a determination of respondent City of Plattsburgh Planning Board granting the request of respondent Prime Plattsburgh, LLC for subdivision and site plan approval.
In 2017, respondent City of Plattsburgh was awarded a $10 million grant to fund various improvement projects in the City's downtown core. The "centerpiece" of those efforts was the proposed redevelopment of approximately 3.4 acres on two adjacent properties, owned by the City, lying between Durkee Street and the Saranac River (hereinafter referred to as the project). The project site includes a brownfield, created by decades of industrial and commercial use at the site, that had been remediated to the satisfaction of the State Department of Environmental Conservation (hereinafter DEC), as well as a former gas station that had undergone oil spill cleaning. The site presently contains the Durkee Street municipal parking lot, the Plattsburgh Farmers' and Crafters' Market Building, a boardwalk running along the Saranac River and a public green space.
In 2018, the City issued a request for proposals "seek[ing] a developer to construct, own, and operate a mixed-use development" at the project site. The City accepted the proposal submitted by respondent Prime Plattsburgh, LLC (hereinafter Prime) "to develop, finance, construct and manage" a development on the project site, which was to be sold by the City to Prime, and a development agreement was executed that took effect in April 2019. Although the exact details of the project have changed somewhat since the execution of the development agreement, it essentially involves the replacement of the municipal parking lot with a mixed-use development that would include apartments, commercial space and underground parking, as well as a surface parking lot. The project further includes the rehabilitation of the farmers' market building and the creation of a public area with an open-air pavilion that connects to a new pedestrian walkway along the Saranac River.
In June 2019, respondent City of Plattsburgh Common Council was designated as the lead agency for purposes of conducting a combined environmental review of the project and the other proposed downtown improvement initiatives as a type I action pursuant to the State Environmental Quality Review Act (see ECL art 8 [hereinafter SEQRA]). Following an extensive review, a draft general environmental impact statement (hereinafter draft GEIS) that discussed the potential environmental impacts of the project and other development initiatives was accepted as complete in November 2019 and offered for public review and comment. Thereafter, a final general environmental impact statement (hereinafter final GEIS) was prepared that incorporated [*2]the draft GEIS and addressed the feedback offered on the project and other initiatives. The Common Council accepted the final GEIS as complete in January 2020 and, in February 2020, issued a SEQRA findings statement in which it concluded that, consistent with the social, economic and other pertinent considerations given the reasonable alternatives, the project and other proposed initiatives, with the mitigation measures set forth, avoided or minimized adverse environmental impacts to the maximum extent practicable.
In its findings, the Common Council acknowledged that the common loon, an aquatic bird that is a species of special concern, was known to occur "on or in the vicinity" of the project site and that the loon "could occur" at the project site given its proximity to Lake Champlain (see 6 NYCRR 182.2 [v]; 182.5 [c] [6] [i]). The Common Council nevertheless found that adverse impacts upon the loon were not anticipated as a part of the project, as the project was not going to disturb the bed or banks of Lake Champlain and was not expected to increase in-water recreational activities. The Common Council further found that no mitigation was required to address the impacts construction at the project site might have upon contaminated soil. This finding was based upon, among other things, DEC having already certified that remediation of the brownfield at the project site was complete and that, under the terms of that certification, the City and any subsequent owner of the project site would have to implement a site management plan (hereinafter SMP) that would employ specified environmental and institutional controls to develop the area. Significantly, the Common Council noted the requirement that a site-specific health and safety plan (hereinafter HASP) was required to be implemented during construction. The Common Council recognized that future owners were "required to comply with the terms and conditions of the SMP."
Meanwhile, multiple applications were made to respondents City of Plattsburgh Zoning Board of Appeals (hereinafter ZBA) and City of Plattsburgh Planning Board seeking the approvals — such as special use permits from the ZBA, as well as subdivision approvals and amendment of a preexisting planned unit development from the Planning Board — needed for the project to move forward. In September 2020, the Common Council amended its SEQRA findings statement to reflect alterations to the project made in the course of the proceedings before the ZBA and the Planning Board, although the provisions of the original findings at issue here were not affected. The ZBA and the Planning Board thereafter adopted SEQRA findings statements with regard to the environmental impacts of those applications that, in relevant part, incorporated the findings and amended findings of the Common Council and determined that the project avoided or minimized adverse environmental impacts to the maximum extent practicable. The ZBA and the Planning Board proceeded to [*3]grant the requested approvals over the course of December 2020 and January 2021.
In February 2021, petitioners commenced this combined CPLR article 78 proceeding and declaratory judgment action seeking, in relevant part, to annul the SEQRA findings of the ZBA and the Planning Board and the approvals from those bodies that ensued. Following joinder of issue, the City, Common Council, Planning Board and ZBA (hereinafter collectively referred to as the City respondents) moved for summary judgment dismissing petitioners' declaratory judgment action and sought dismissal of the entire petition/complaint because, for among other reasons, petitioners lacked standing to sue. Prime moved for similar relief. Petitioners, in turn, moved for a variety of relief that included striking Prime's answer. Supreme Court thereafter issued a judgment in which it, in relevant part, partially denied respondents' motions and partially granted the petition/complaint. Of relevance here, Supreme Court determined that petitioners had standing to sue and that the ZBA and the Planning Board had not taken the requisite hard look at the environmental impacts of the project as required by SEQRA, namely, by failing to adequately explore the effect that the project might have on the common loon and the potential risk that construction work at the project site would disturb the contaminated soil there.[FN1] Supreme Court therefore annulled the SEQRA findings statements adopted by the ZBA and the Planning Board, as well as the approvals issued in reliance thereon. The court further determined that petitioners' fourth cause of action, which sought a declaration that the development agreement was invalid in that it improperly sought to convey City-owned waterfront property to Prime in violation of General City Law § 20 (2), was academic because the court's annulment of the ZBA and the Planning Board approvals on SEQRA grounds meant that the project, including the conveyance, would not proceed.[FN2] The City respondents and Prime separately appeal, with Prime relying upon the arguments advanced by the City respondents in lieu of filing its own brief.
To begin, we reject respondents' claim that Supreme Court erred in declining to dismiss this matter on standing grounds. As the standing issue was raised, petitioners "were obliged to show an actual stake in the controversy by 'establishing both an injury-in-fact and that the asserted injury is within the zone of interests sought to be protected by the statute alleged to have been violated' " (Matter of Town of Waterford v New York State Dept. of Envtl. Conservation, 187 AD3d 1437, 1439 [3d Dept 2020], quoting Matter of Association for a Better Long Is., Inc. v New York State Dept. of Envtl. Conservation, 23 NY3d 1, 6 [2014]; see Matter of Creda, LLC v City of Kingston Planning Bd., 212 AD3d 1043, 1045 [3d Dept 2023]). The injury in question in the SEQRA context must be a direct one distinguishable from generalized environmental concerns and, while [*4]the "close physical proximity as a neighbor to a proposed project may give rise to an inference of direct harm, . . . standing will not be recognized unless the neighbor can show that the close proximity exposes [him or] her to a harm different from the harm experienced by the public generally" (Matter of Basha Kill Area Assn. v Planning Bd. of Town of Mamakating, 46 AD3d 1309, 1311 [3d Dept 2007], lv denied 10 NY3d 712 [2008]; see Matter of Creda, LLC v City of Kingston Planning Bd., 212 AD3d at 1045; Matter of Ziemba v City of Troy, 37 AD3d 68, 71 [3d Dept 2006], lv denied 8 NY3d 806 [2007]).
Here, two of the individual petitioners, L. David Boise and John S. Seiden, own real property in close proximity to the project site, with Boise's property approximately 250 feet away and Seiden's property approximately 50 feet away. The inference from that proximity is that both will suffer direct harm, and that inference is supported by their assertion that they will be placed at risk by "the removal of tens of thousands of tons of toxic dirt" from the project site if construction proceeds. Their concerns in that regard were not conjectural, with a newspaper article in the record reflecting how even Prime's principal acknowledged the "risk for contaminated soil" at the project site despite its remediation. Further, the findings statement adopted by the Common Council, and followed by the ZBA and the Planning Board, specifically identified the risk that disturbing the soil might pose to neighbors, noting that "[a]ny excavated topsoil" from the project site would have "to be tested and properly handled to protect the health and safety of workers and the nearby community" (emphasis added). In short, even accepting that "not every petitioner may have established standing," Boise and Seiden did, and Supreme Court properly rejected respondents' efforts to seek dismissal of this matter on standing grounds (Matter of Town of Waterford v New York State Dept. of Envtl. Conservation, 187 AD3d at 1440; see Matter of Sierra Club v Village of Painted Post, 26 NY3d 301, 311 [2015]; Matter of Basha Kill Area Assn. v Planning Bd. of Town of Mamakating, 46 AD3d at 1311).
Turning to the merits of petitioners' challenges to the SEQRA findings ultimately adopted by the ZBA and the Planning Board, "a reviewing court must not substitute its judgment of the facts and alternatives for that of the agency, and an agency's obligation under SEQRA must be viewed in light of a rule of reason, realizing that not every conceivable environmental impact, mitigating measure or alternative must be identified and addressed before the substantive dictates of SEQRA are satisfied" (Matter of Keil v Greenway Heritage Conservancy for the Hudson Riv. Val., Inc., 184 AD3d 1048, 1051 [3d Dept 2020] [internal quotation marks and citation omitted]; see Matter of Jackson v New York State Urban Dev. Corp., 67 NY2d 400, 416 [1986]). Instead, our review is "limited to whether the [pertinent] agency identified [*5]the relevant areas of environmental concern, took a hard look at them, and made a reasoned elaboration of the basis for its determination" (Matter of Riverkeeper, Inc. v Planning Bd. of Town of Southeast, 9 NY3d 219, 231-232 [2007] [internal quotation marks and citation omitted]; see Matter of Friends of P.S. 163, Inc. v Jewish Home Lifecare, Manhattan, 30 NY3d 416, 430 [2017]; Matter of Save the Pine Bush, Inc. v Town of Guilderland, 205 AD3d 1120, 1123 [3d Dept 2022]). The determination will "only be annulled 'if it is arbitrary, capricious or unsupported by the evidence' " (Matter of Van Dyk v Town of Greenfield Planning Bd., 190 AD3d 1048, 1049 [3d Dept 2021], quoting Matter of Riverkeeper, Inc. v Planning Bd. of Town of Southeast, 9 NY3d at 232; see Matter of Keil v Greenway Heritage Conservancy for the Hudson Riv. Val., Inc., 184 AD3d at 1052).
With the foregoing in mind, Supreme Court determined that, in relying upon the SEQRA findings of the Common Council, the ZBA and the Planning Board failed to take the requisite hard look at the environmental impacts of the project with regard to the common loon and the disturbance of contaminated soil at the project site. As for the common loon, the record reflects that there were known occurrences of the bird in nearby Lake Champlain and that the bird could be present in the vicinity of the project site, which the draft GEIS acknowledged. It went on, however, to cite information from DEC reflecting that the common loon inhabited lakes and had a preference for larger, undisturbed ones, and that human activities in a lake and development on its shoreline are known to have various negative impacts on the birds. There was accordingly no obvious reason to dwell upon the question of whether the common loon would be impacted by a change to the project site — a site that, to reiterate, is in a long-developed area of the City's downtown and is not on the shore of Lake Champlain — when the relevant issue was whether the proposed development would increase usage of Lake Champlain or impact its waterfront in some manner. The Common Council addressed that issue in its initial SEQRA findings statement, finding that there would be no significant negative environmental impacts upon the common loon because the project would not involve any work in, or cause any disturbance to, "the bed or banks of Lake Champlain." Contrary to the conclusion of Supreme Court, the foregoing reflects that, as required by SEQRA, the ZBA and the Planning Board, having relied upon the findings of the Common Council, "identified potential avian impacts as an area of environmental concern, took the requisite hard look and made a reasoned elaboration of the basis for its determination" (Matter of Hart v Town of Guilderland, 196 AD3d 900, 905 [3d Dept 2021]).
As for the potential dangers posed by the disturbance of contaminated soil at the project site, "SEQRA requires the preparation of an [environmental impact statement (hereinafter EIS)] [*6]on any action which may have significant effect on the environment. The EIS must include, among other things, a description of the proposed action, its environmental impact and mitigation measures proposed to minimize the environmental impact" (Matter of Bronx Comm. for Toxic Free Schs. v New York City Sch. Constr. Auth., 20 NY3d 148, 155 [2012] [internal quotation marks, ellipsis and citations omitted]). Significantly, "[o]pportunity for public participation and engagement is an essential and mandatory part of the SEQRA process" (Matter of Friends of P.S. 163, Inc. v Jewish Home Lifecare, Manhattan, 30 NY3d at 426). "A lead agency improperly defers its duties when it abdicates its SEQRA responsibilities to another agency or insulates itself from environmental decision[-]making" (Matter of Riverkeeper, Inc. v Planning Bd. of Town of Southeast, 9 NY3d at 234 [citations omitted]; see Matter of Bergami v Town Bd. of the Town of Rotterdam, 97 AD3d 1018, 1021-1022 [3d Dept 2012]). With that being said, "a lead agency without environmental expertise to evaluate a project may rely on outside sources and the advice of others in performing its function" (Matter of Penfield Panorama Area Community v Town of Penfield Planning Bd., 253 AD2d 342, 350 [4th Dept 1999]), so long as the lead agency "exercise[s] its own judgment in determining whether a particular circumstance adversely impacts the environment" (Matter of Riverkeeper, Inc. v Planning Bd. of Town of Southeast, 9 NY3d at 234). Significantly, "[t]he Brownfield Program and SEQRA serve related but distinct purposes" (Matter of Bronx Comm. for Toxic Free Schs. v New York City Sch. Constr. Auth., 20 NY3d at 156).
As indicated by Supreme Court, during the SEQRA process, the Common Council placed heavy reliance on a statement made by DEC during the remediation process that there was no exposure risk at the project site. However, this statement cannot be read in a vacuum. Rather, a full reading of the documents contained in appendix F of the final GEIS reveals that should the current use, which at the time of DEC's statement was a paved parking lot, not change, exposure risk was minimal. These documents did not speak to the risk of exposure upon a breach of the surface of the parking lot, which was exactly what the project contemplated; therefore, these documents in and of themselves did not speak to the contamination risks posed by the project. Indeed, the environmental restoration record of decision (hereinafter the ROD) which was created during the remediation reflects that DEC determined that "[n]o [f]urther [a]ction with institutional controls in the form of an environmental easement limiting use of the site to restricted residential activity in conformance with local zoning, including the continued use as a parking lot," was appropriate. The ROD set forth three components for the remediation of the contamination, one of which required compliance with an approved SMP. As relevant here, the SMP states [*7]that "[i]f intrusive work is expected to breach the surface cover system at the [project site], contractors performing redevelopment or maintenance activities will be required to prepare and follow a site specific, activity specific, [HASP]." Although, the draft GEIS and the final GEIS contemplated the implementation of future construction safety measures to address risks through the implementation of a HASP, the HASP has not been created. This is not to say that the Common Council, as the lead agency, needs to create the HASP itself, but rather that the HASP, in some form,[FN3] needs to be created and subject to review as part of the SEQRA process (see generally Matter of Bronx Comm. for Toxic Free Schs. v New York City Sch. Constr. Auth., 20 NY3d at 155-156).[FN4] Moreover, since the HASP is not included in the draft GEIS or final GEIS, the public will not be able to comment on whether it is appropriate and, as Supreme Court found, it is "therefore shielded from public scrutiny." The court found it untenable that it was determined that there were no dangers or environmental impacts because individuals and entities in the future were required to have plans — but that those plans were unknown at the time (see id.; compare Matter of Town of Copake v New York State Office of Renewable Energy Siting, 216 AD3d 93, 103 [3d Dept 2023]).
Here, Supreme Court correctly determined that, although the soil contamination was addressed, the ZBA and Planning Board failed to take a hard look at this issue (see ECL 8-0109; Matter of Hart v Town of Guilderland, 196 AD3d at 903-904). More specifically, the failure in providing mitigation measures for this environmental concern did not comply with the mandates of SEQRA (see ECL 8-0109 [2] [f]; see generally Matter of Bronx Comm. for Toxic Free Schs. v New York City Sch. Constr. Auth., 20 NY3d at 156-157). Preliminarily, the Common Council, and thereafter the Planning Board and ZBA, properly relied on DEC correspondence in determining that the project site in its current form did not present adverse environmental impacts (see generally Matter of Penfield Panorama Area Community v Town of Penfield Planning Bd., 253 AD2d at 349-350).[FN5] Here, however, it was inappropriate to determine that there would be no adverse environmental impacts when it was known that the contemplated site plan would necessarily disturb the contaminated soil (see Matter of Riverkeeper, Inc. v Planning Bd. of Town of Southeast, 9 NY3d at 233-234).[FN6] Moreover, not only is the HASP not included in the final GEIS, despite indicating the necessity for same, but the creation of such would not occur until after the SEQRA process, which would insulate it from public scrutiny (see generally Matter of Bronx Comm. for Toxic Free Schs. v New York City Sch. Constr. Auth., 20 NY3d at 156-157). Here, the issue is not that the entities need to comply with certain regulations in the future (see Matter of Basha Kill Area Assn. v Planning Bd. of Town of Mamakating, 46 AD3d [*8]at 1312); rather, the issue is the deferral of the creation of a HASP, the necessity of which is imminent given that this project expressly contemplates excavation, to mitigate exposure to the contaminated soil (see Matter of Riverkeeper, Inc. v Planning Bd. of Town of Southeast, 9 NY3d at 234; Matter of Bergami v Town Bd. of the Town of Rotterdam, 97 AD3d at 1021-1022; compare Matter of Friends of P.S. 163, Inc. v Jewish Home Lifecare, Manhattan, 30 NY3d at 431).[FN7] The failure to include this plan demonstrates noncompliance with the mandates of SEQRA (see Matter of Penfield Panorama Area Community v Town of Penfield Planning Bd., 253 AD2d at 349-350; see generally Matter of Adirondack Historical Assn. v Village of Lake Placid/Lake Placid Vil., Inc., 161 AD3d 1256, 1259-1260 [3d Dept 2018]; compare Matter of Riverkeeper, Inc. v Planning Bd. of Town of Southeast, 9 NY3d at 234-235). The fact that the brownfield remediation was successful at the time does not discharge the involved agency's duty to take a hard look relative to the project (see generally Matter of Bronx Comm. for Toxic Free Schs. v New York City Sch. Constr. Auth., 20 NY3d at 156-157). Indeed, the citizens who may be impacted have the right to insist that the construction be done in an environmentally safe manner in accordance with SEQRA.
All of this is not to say that we disagree that the former remediation efforts by the DEC and the City are laudable and comprehensive, because they were. However, the project requires material changes to the status quo, in particular excavation of the asphalt parking lot which serves as a cap and the attendant disposal of 86,000 tons of soil, neither of which were nor could be properly analyzed at the time that DEC was involved with remediation of the site. Publicly identifying these new site-specific tangible environmental impacts and proposing mitigation is the cornerstone of SEQRA review, which is distinct from brownfield remediation. Since we do not believe this was done, it is our opinion that Supreme Court properly granted that portion of the petition/complaint that was seeking to annul the SEQRA findings statements adopted by the ZBA and the Planning Board in this regard.
Clark and Fisher, JJ., concur.
Egan Jr., J.P. (dissenting in part.)
As the majority describes, the primary issue in this case is whether respondents City of Plattsburgh Zoning Board of Appeals (hereinafter ZBA) and City of Plattsburgh Planning Board complied with the State Environmental Quality Review Act (see ECL art 8 [hereinafter SEQRA]) by taking a hard look at the environmental impacts of a proposed redevelopment of properties owned by respondent City of Plattsburgh and lying squarely in the City's downtown. We agree with our colleagues that petitioners have standing to advance their SEQRA challenge. Unlike Supreme Court and the majority, however, we are satisfied that the ZBA and the Planning Board satisfied their obligations under SEQRA in all respects. We therefore [*9]respectfully dissent on that point.
At the outset, some detail is required as to the history of cleanup efforts at the site. The property which is the subject of this appeal is located in downtown Plattsburgh and is adjacent to the Saranac River (hereinafter referred to as the north site). For many years, the north site and the adjoining property to the south (hereinafter referred to as the south site) were used for various commercial purposes that included automotive repair, dry cleaning, sign painting and milling. These uses resulted in petroleum and other chemical spills on both sites. Starting in the mid-1960s, the City began acquiring ownership of both sites and demolished the existing buildings. By the early 2000s, the sites contained, among other things, a large municipal parking lot and a farmers' market pavilion.
The construction of an office building and adjacent parking garage was proposed for the south site and, in 2004, the State Department of Environmental Conservation (hereinafter DEC) undertook a remedial investigation at the City's request in order to assess and address the threat that the contaminated subsurface soil and groundwater at both sites posed to human health. Testing revealed the presence of various pollutants in the subsurface soils and groundwater at the sites, and interim remedial measures were taken that included the location and removal of four underground storage tanks and the removal of 9,614 tons of contaminated soil from the south site. DEC found that those measures had resulted in improved groundwater quality, although monitoring would be required "to document the long-term effectiveness of the soil excavation" on the groundwater. It further determined that "the majority of the site[s'] . . . [soil] contamination was addressed" by the soil excavation. As such, DEC concluded that the interim measures had accomplished the remediation goals for the sites so long as there was continuing monitoring of the groundwater and the development of a plan to address whatever contaminated soils remained "during potential future intrusive activities." DEC accordingly found that no further action was required for either site beyond the grant of an environmental easement to the State, the development of a site management plan (hereinafter SMP) to govern future ground-intrusive work on both sites, and ongoing institutional and engineering controls that would be prepared by an engineer acceptable to DEC and would remain in place until DEC determined that they were no longer needed. A three-story office building and two-story parking garage were thereafter completed on the south site, leaving the north site to be redeveloped at a later date. It is that redevelopment that led to the proceedings at issue here.
With that history in mind, as the majority states, our review of a SEQRA determination is quite limited, and we "must not substitute [our] judgment of the facts and alternatives for that of the agency, and an agency's obligation [*10]under SEQRA must be viewed in light of a rule of reason, realizing that not every conceivable environmental impact, mitigating measure or alternative must be identified and addressed before the substantive dictates of SEQRA are satisfied" (Matter of Keil v Greenway Heritage Conservancy for the Hudson Riv. Val., Inc., 184 AD3d 1048, 1051 [3d Dept 2020] [internal quotation marks and citations omitted]; see Matter of Jackson v New York State Urban Dev. Corp., 67 NY2d 400, 417 [1986]). Our review is instead "limited to whether the [pertinent] agency identified the relevant areas of environmental concern, took a hard look at them, and made a reasoned elaboration of the basis for its determination" (Matter of Riverkeeper, Inc. v Planning Bd. of Town of Southeast, 9 NY3d 219, 231-232 [2007] [internal quotation marks and citation omitted]; see Matter of Friends of P.S. 163, Inc. v Jewish Home Lifecare, Manhattan, 30 NY3d 416, 430 [2017]; Matter of Save the Pine Bush, Inc. v Town of Guilderland, 205 AD3d 1120, 1123 [3d Dept 2022]).
Supreme Court determined that, in relying upon the SEQRA findings of respondent City of Plattsburgh Common Council, the ZBA and the Planning Board failed to take the requisite hard look at the disturbance of contaminated soil at the north site. The extensive records regarding that site's remediation under DEC oversight were before the Common Council during its SEQRA review, however, and those records reflect that there was no mystery as to the degree and extent of contamination at the site by the time that remediation had concluded. To the contrary, the records detail how the nature and location of contaminated soil were identified via testing and the review of historical records, as well as the placement of monitoring wells at the north site to "further delineate the extent of" the groundwater contamination there.[FN8] DEC concluded that the measures had addressed the "majority of the site's . . . contamination."
DEC accordingly determined that no further action was needed beyond institutional and engineering controls and the implementation of an SMP. The required controls included the grant of an environmental easement by the City to the State that, among other things, allowed future development at the north site but limited the nature of that development to restricted residential and zoning-appropriate commercial uses (see ECL 71-3605). The SMP also explicitly contemplated that the north site would be redeveloped in the future, requiring that DEC be consulted regarding any future ground-intrusive work at the site, that steps such as misting and air monitoring be implemented to address the problem of blowing dust caused by that work, and that any excavated soil be tested, properly handled and "managed in a manner acceptable to [DEC]." The SMP also detailed how any contractor who performed that work must "prepare and follow a site specific, activity specific, Health and Safety Plan" (hereinafter HASP). Although a HASP has not yet [*11]been completed — a failure that is not surprising since it is the contractors performing the redevelopment work, which has not yet commenced or been put out to bid, who prepare the HASP under the terms of the SMP — the SMP leaves no doubt as to what will be included in it. The SMP dictates that any redevelopment will be subject to provisions for air monitoring to protect the community and, moreover, comply with specific guidelines set forth by the federal Occupational Safety and Health Administration, the State Department of Health and DEC. The City met its obligations under the remediation plan in all respects and, in 2016, DEC issued a certificate of completion finding that remediation at the north site had "achieved a cleanup level that would be consistent with" restricted residential, commercial and industrial uses so long as the existing institutional and engineering controls remained in place and the terms of the environmental easement and SMP were followed.[FN9]
The Common Council, at the conclusion of its SEQRA review of the project at issue here, found that no mitigation was required to address the impacts that construction at the north site might have upon contaminated soil because, among other things, DEC had already certified that remediation at the north site was complete and that the terms of that certification left no doubt as to what the City and any subsequent owner of the north site would have to do during future redevelopment, employing specified environmental and institutional controls and complying with a site-specific HASP. In other words, the north site has already been remediated to DEC's satisfaction and standards have been put in place to govern how the contaminated soil at the north site will be handled during any redevelopment, and those facts were explicitly noted by the Common Council in its initial SEQRA findings statement. The Common Council therefore found that disturbing the contaminated soil would not generate significant adverse environmental impacts requiring mitigation.
In our view, the Common Council's findings on that point were in no way an improper abdication of "its SEQRA responsibilities to another agency or" an effort to "insulate[ ] itself from environmental decisionmaking" (Matter of Riverkeeper, Inc. v Planning Bd. of Town of Southeast, 9 NY3d at 234); rather, the Common Council squarely addressed the "very areas of environmental concern upon which [it] allegedly deferred its independent judgment" and determined that the remediation at the site and the existing standards to be followed in the event of redevelopment were sufficient to address the risks posed by the contaminated soil (id.; see Matter of Basha Kill Area Assn. v Planning Bd. of Town of Mamakating, 46 AD3d 1309, 1312 [3d Dept 2007], lv denied 10 NY3d 712 [2008]; cf. Matter of Penfield Panorama Area Community v Town of Penfield Planning Bd., 253 AD2d 342, 350 [4th Dept 1999]). This was a hard look at the environmental risks posed by the contaminated [*12]soil and, even accepting that a different conclusion could be justified upon the evidence before the Common Council, it is not our place to second-guess its reasoned judgment that the risk was appropriately addressed by the standards already in place and did not require further mitigation (see Matter of Jackson v New York State Urban Dev. Corp., 67 NY2d at 427-428; Matter of Morse v Town of Gardiner Planning Bd., 164 AD2d 336, 341-342 [3d Dept 1990]). We are therefore satisfied that the Common Council met its obligations under SEQRA and, Supreme Court having found no other deficiencies in its findings, the ZBA and the Planning Board were free to, and did, adopt the Common Council's findings as their own. Thus, in our view, Supreme Court erred in annulling the SEQRA determinations of the ZBA and the Planning Board, and the approvals and modifications that followed them, on SEQRA grounds.
Ceresia, J., concurs.
ORDERED that the judgment is modified, on the law, without costs, by reversing so much thereof as annulled that portion of the SEQRA findings statements of respondents City of Plattsburgh Planning Board and City of Plattsburgh Zoning Board of Appeals as to the common loon; said portion of petitioners' CPLR article 78 proceeding and declaratory judgment action dismissed; and, as so modified, affirmed.

Footnotes

Footnote 1: We note that Supreme Court concluded that petitioners' challenges to the Common Council's SEQRA findings statement and amended findings statement, as opposed to the SEQRA determinations of the ZBA and the Planning Board relying upon them, were time-barred. Petitioners did not appeal from the judgment, however, and do not attack that aspect of it in their brief.

Footnote 2: Prior to the commencement of this matter, a combined CPLR article 78 proceeding and declaratory judgment action was commenced by several of the petitioners in this matter that sought a declaration that the development agreement violated General City Law § 20 (2). In October 2020, Supreme Court granted the motion of the City and the Common Council, as well as the motion of Prime, to dismiss that action and proceeding as unripe.

Footnote 3: It is possible that the HASP will change in the future, depending on the conditions encountered once the surface is breached. Moreover, it would not be inappropriate for the developer or its agents to draft the HASP that would be subject to SEQRA review.

Footnote 4: Although here, unlike in Matter of Bronx Comm. for Toxic Free Schs. v New York City Sch. Constr. Auth. (20 NY3d at 155-156), an SMP was created prior to the SEQRA process, the HASP was not. It is this failure with which we take issue.

Footnote 5: We note that Matter of Penfield Panorama Area Community v Town of Penfield Planning Bd. (253 AD2d at 342) is directly on point. In that case, the Fourth Department determined that a planning board's conditioning of its approval of a project involving a hazardous waste remediation issue on approval from DEC and the Monroe County Department of Health was inappropriate because it shielded the remediation plan from public scrutiny (see id. at 349). Specifically, the Fourth Department stated that "by deferring resolution of the hazardous waste remediation issue, the Planning Board failed to take the requisite hard look at an area of environmental concern" (id. at 350).

Footnote 6: The president of Prime, the developer of the project, raised such concerns in a newspaper article after the certification of the SEQRA findings statements, explaining that Prime would have to "export approximately 86,000 tons of [soil] in order to develop the [project] site."

Footnote 7: The dissent cites to Matter of Riverkeeper, Inc. v Planning Bd. of Town of Southeast (9 NY3d 219) in support of its decision. While that case involved a similar situation, it is our opinion that a close reading supports affirmance of Supreme Court's decision. In that case, a consultant corresponded with the New York City Department of Environmental Protection (hereinafter NYCDEP) "to formulate a suitable Stormwater Pollution Prevention Plan that would comply with NYCDEP's regulations" (id. at 232). Thereafter, an actual plan was put in place — for this reason, the Court of Appeals determined that the lead agency took the requisite hard look (see id. at 233). Specifically, the Court of Appeals stated that the Board's file included the permit applications for wetlands activities, the State Pollutant Discharge Elimination System and the Stormwater Pollution Prevention Plan (see id. at 235), which are the very areas of environmental concern upon which the lead agency allegedly deferred its independent judgment. Here, although there is a file with the ROD and the SMP, in this circumstance the SMP specifically calls for a HASP that would need to comply with local ordinances and regulations. However, the HASP has not been created (compare id.).

Footnote 8: Notably, DEC determined in 2018 that no further groundwater monitoring was necessary at the north site and that the monitoring wells could be decommissioned because, among other things, "groundwater contaminants show[ed] a decreasing contaminant trend and [were] just slightly above groundwater standards."

Footnote 9: The majority's commentary regarding the necessity of a complete general environmental impact statement is well taken, as the Court of Appeals has faulted a SEQRA review undertaken without a completed SMP (see Matter of Bronx Comm. for Toxic Free Schs. v New York City Sch. Constr. Auth., 20 NY3d 148, 155-157 [2012]). In this case, however, an SMP was completed prior to the SEQRA review and was the subject of public comment during that review.